# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| GLOBAL ENERGY HOLDINGS GROUP, INC., *et al.*,[1] | ) | Case No. 09-14192 (PJW) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |

## DISCLOSURE STATEMENT RELATING TO CHAPTER 11 PLAN OF REORGANIZATION OF GLOBAL ENERGY HOLDINGS GROUP, INC., AUGUSTA BIOFUELS, LLC, SPRING HOPE BIOFUELS, LLC, XETHANOL BIOFUELS, LLC, AND GES – LIVE OAK HICKORY RIDGE, LLC

Charles J. Brown III, Esq. (No. 3368)
Archer & Greiner, P.C.
300 Delaware Avenue, Suite 1370
Wilmington, DE 19801
Tel: (302) 777-4350
Fax: (302) 777-4352
E-Mail: cbrown@archerlaw.com

-and-

Gayle Ehrlich, Esq. (*pro hac vice*)
Christopher M. Gosselin, Esq. (*pro hac vice*)
Sullivan & Worcester LLP
One Post Office Square
Boston, MA 02109
Tel: (617) 338-2800
Fax: (617) 338-2880
E-Mail: gehrlich@sandw.com
E-Mail: cgosselin@sandw.com

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

Dated: June 29, 2010

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each debtor's federal tax identification number, if applicable, are: (i) Global Energy Holdings Group, Inc. (9517); (ii) Augusta Biofuels, LLC (8446); (iii) Spring Hope Biofuels, LLC (9517); (iv) Xethanol Biofuels, LLC (5217); and (v) GES – Live Oak Hickory Ridge, LLC (5710). The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, P.O. Box 724028, Atlanta, Georgia 31139.

# DISCLAIMER

GLOBAL ENERGY HOLDINGS GROUP, INC., AUGUSTA BIOFUELS, LLC, SPRING HOPE BIOFUELS, LLC, XETHANOL BIOFUELS, LLC, AND GES – LIVE OAK HICKORY RIDGE, LLC (COLLECTIVELY THE "DEBTORS") URGE CREDITORS TO VOTE TO ACCEPT THE CHAPTER 11 PLAN OF REORGANIZATION OF GLOBAL ENERGY HOLDINGS GROUP, INC., AUGUSTA BIOFUELS, LLC, SPRING HOPE BIOFUELS, LLC, XETHANOL BIOFUELS, LLC, AND GES – LIVE OAK HICKORY RIDGE, LLC (THE "PLAN"), A COPY OF WHICH IS INCLUDED HEREWITH AS APPENDIX A.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") RELATING TO THE CHAPTER 11 PLAN OF REORGANIZATION OF GLOBAL ENERGY HOLDINGS GROUP, INC., AUGUSTA BIOFUELS, LLC, SPRING HOPE BIOFUELS, LLC, XETHANOL BIOFUELS, LLC, AND GES – LIVE OAK HICKORY RIDGE, LLC IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES TO THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES AND ASSUMPTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS. EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

{B1117379; 4}

# TABLE OF CONTENTS

I.      INTRODUCTION AND RECOMMENDATION. ..................................................1
        A.    Treatment of Claims and Equity Interests Under the Plan. ...................2
II.     PURPOSE OF DISCLOSURE STATEMENT. .................................................2
III.    THE PLAN VOTING INSTRUCTIONS AND PROCEDURES. ....................3
        Definitions. ...........................................................................................................3
        A.    Notice to Holders of Claims and Holders of Equity Interests. ...........3
        B.    Solicitation Package. .................................................................................4
        C.    Voting Procedures, Ballots and Voting Deadline. ................................4
        D.    Hearing and Deadline for Objections to Confirmation of Plan. .........5
IV.     HISTORY OF THE DEBTORS AND EVENTS LEADING TO BANKRUPTCY..........5
        A.    Background Relating to Purchase of Property and Subsequent Disputes
              with Secured Lenders. ...............................................................................5
        B.    Circumstances Leading to Commencement of the Chapter 11 Case......6
V.      THE CHAPTER 11 CASE. ..............................................................................7
        A.    First Day Motions and Orders Approving Same. ..................................7
        B.    Filing of Required Documents. ...............................................................8
        C.    Appointment of Debtors' Professionals. ...............................................9
        D.    Appointment of a Creditors' Committee. ............................................12
        E.    Efforts to Sell Property. ..........................................................................12
        F.    Change of Venue. .....................................................................................13
        G.    Settlement with Landlord. ......................................................................13
        H.    General Claims Bar Date. .......................................................................14
        I.    Filing of Initial Plan and Related Disclosure Statement; Bankruptcy Court
              Approval Agreement. ..............................................................................14
        J.    Interim Approval of this Disclosure Statement. ..................................14
VI.     SUMMARY OF THE PLAN. ..........................................................................15
        A.    Classification and Treatment of Claims and Equity Interests. ............15
        B.    General Unsecured Claims. .....................................................................16
        C.    Equity Interests. .......................................................................................17
        D.    Unclassified Claims – Administrative Expense Claims and Priority
              Claims. ......................................................................................................17
VII.    PROVISIONS FOR THE EXECUTION AND IMPLEMENTATION OF THE
        PLAN. ...........................................................................................................18
        A.    Substantive Consolidation .....................................................................18
        B.    Sale of the Real Property and Certain Personal Property. ..................19
        C.    Corporate Action. ....................................................................................20
        D.    Establishment of Liquidating Trust / Vesting of Assets. ....................20
        E.    Distributions from the Liquidating Trust under the Plan. ...................24
        F.    Objections to Claims and Administrative Expense Claims..................27
        G.    Setoff, Recoupment and Subordination. ..............................................27
        H.    Preservation of Causes of Action, Rights and Defenses. ...................28
VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ........................28

    A.    Rejection Procedures. ...................................................................................29
    B.    Damage Claims. .........................................................................................29

IX.    RELEASE, DISCHARGE AND LIMITATIONS OF LIABILITY. ...................29
    A.    Discharge. ..................................................................................................30
    B.    Injunction Relating to the Plan. .................................................................30
    C.    Cancellation and Release of Existing Indebtedness and Liens. ................30
    D.    Releases. ....................................................................................................30
    E.    Limitation of Liability. ..............................................................................31

X.    EFFECTIVENESS OF THE PLAN AND IMPLICATIONS THEREOF. ........31
    A.    Definition of Effective Date. .....................................................................31
    B.    Bar Dates Triggered Upon Occurrence of Effective Date. .......................32
    C.    Bankruptcy Court's Retention of Jurisdiction. .........................................32

XI.    CERTAIN FACTORS TO BE CONSIDERED. ............................................32
    A.    General Considerations. ............................................................................32
    B.    Federal Income Tax Consequences. ..........................................................32

XII.    FEASIBILITY OF THE PLAN, THE BEST INTERESTS OF CREDITORS
    AND "CRAMDOWN." ...............................................................................34
    A.    Feasibility of the Plan. ..............................................................................34
    B.    Acceptance of the Plan. .............................................................................34
    C.    Best Interests of Creditors Test. ................................................................34
    D.    Confirmation with Acceptance of an Impaired Class: the "Cramdown"
        Alternative. ................................................................................................35

XIII.    ALTERNATIVES TO THE PLAN. ...............................................................36
    A.    Continuation of the Chapter 11 Case. .......................................................36
    B.    Alternative Plans of Reorganization. ........................................................36
    C.    Liquidation of the Debtors under Chapter 7 or Dismissal of the Chapter 11
        Case. ..........................................................................................................36

XIV.    CONCLUSION ............................................................................................36
    A.    Voting Requirements. ................................................................................36
    B.    Hearing on and Objections to Confirmation of the Plan. ..........................38

**APPENDICES**

APPENDIX A

Chapter 11 Plan of Reorganization of Global Energy Holdings Group, Inc., Augusta Biofuels, LLC, Spring Hope Biofuels, LLC, Xethanol Biofuels, LLC, and GES – Live Oak Hickory Ridge, LLC

## I.  INTRODUCTION AND RECOMMENDATION.

### *THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN*

The Debtors ***recommend*** that holders of Claims ***vote to accept*** the Plan because it provides for a greater distribution to creditors than they would likely otherwise receive.  The Debtors believe the Plan is likely, although not certain, to allow recovery for holders of Allowed Class 1 (General Unsecured Non-priority) Claims of approximately **70 - 100%,** which may be further augmented by additional amounts (if any) that may be recovered by the Liquidating Trustee on behalf of the Liquidating Trust from Liquidating Trust Assets that pass to the Liquidating Trust under the Plan; and that general unsecured creditors are likely to receive less through additional cost and delays, among other things, if the Plan is not confirmed.

The following introduction to the Plan is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Disclosure Statement and the Plan.  All capitalized terms not defined in the Disclosure Statement have the meanings ascribed to such terms in the Plan.

The means for implementing the Plan is premised, in large part, on the proposed sale of all of the Debtors' assets with an available market.  As the assets are liquidated, all net proceeds will be used to fund a Liquidating Trust from which will be paid a distribution to holders of Allowed Class 1 Claims, and if and to the extent Allowed Class 1 Claims receive payment of 100% of their Claims, then distributions will be directed to Allowed Class 2 Claims.

On the Effective Date, (i) the Debtors shall be deemed to have transferred or assigned the Debtor Causes of Action and the Avoidance Power Causes of Action to the Liquidating Trust (if and to the extent that such Causes of Action have not been waived, released, compromised, settled or abandoned pursuant to the Plan) and the Liquidating Trustee shall be deemed substituted for the Debtors in any pending Causes of Action; and (ii) all other Remaining Assets shall be transferred or assigned to the Liquidating Trust in such form as is reasonably acceptable to the Liquidating Trustee.  The Liquidating Trust Assets shall be applied to satisfy, in the following order of priority, (i) Allowed Administrative Expense Claims, including Allowed Professional Fees, (ii) the expenses of the Liquidating Trust, (iii) Allowed Priority Claims, (iv) Allowed Class 1 (general unsecured) Claims, and after payment in full of all Allowed Class 1 Claims (v) Allowed Class 2 Claims.  Allowed Class 1 Claims shall be paid in cash their pro rata shares of the assets in the Liquidating Trust after payment of the above higher priority claims.

***The Debtors believe that the Plan is in the best interest of the Estate and accordingly recommend that Creditors vote to accept the Plan.***  After accounting for Allowed Administrative Expense Claims, Allowed Professional Fees and Expenses and Allowed Priority Claims, which will be satisfied in that order by the Liquidating Trust Assets, the Debtors estimate that there will be approximately $4.0 million available for distribution to holders of Allowed Class 1 Claims.

Conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code would entail additional cost and delay.

## A. Treatment of Claims and Equity Interests Under the Plan.

Claims against and Equity Interests in the Debtors are divided into two (2) Classes. The table below summarizes the classification and treatment of these Claims and Equity Interests under the Plan. For a more detailed description of the classification and treatment for these Classes, please see the section of this Disclosure Statement entitled "Classification and Treatment of Claims and Equity Interests." Estimated claim amounts are based upon the Debtors' books and records and a review of the Claims filed in the Chapter 11 Case.

| Class Description | Treatment Under Plan |
|---|---|
| Class 1 – General Unsecured Claims<br><br>Estimated Allowed Amount:<br><br>$3.5 – 4.0 million | Each holder of an Allowed General Unsecured Claim shall be paid in Cash its pro rata share of the then available Class 1 Distribution from the Liquidating Trust.<br><br>**THIS CLASS IS IMPAIRED AND ENTITLED TO VOTE.** |
| Class 2 – Equity Interests<br><br>Estimated Allowed Amount:<br><br>$0.00 | **All Equity Interests shall be cancelled on the Effective Date.**<br><br>**THIS CLASS IS UNIMPAIRED AND NOT ENTITLED TO VOTE.** |

**\*Except as expressly provided for in the Plan, interest shall neither accrue nor be paid on any Claim.**

## II. PURPOSE OF DISCLOSURE STATEMENT.

The Debtors submit this disclosure statement pursuant to section 1125 of the United States Bankruptcy Code (the "Bankruptcy Code") for use in the solicitation of votes on the Plan proposed by the Debtors as filed with the Court, a copy of which is annexed to this Disclosure Statement as Appendix A.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition history and some of the material events and occurrences during the course of this Chapter 11 Case. This Disclosure Statement describes the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims in impaired Class 1 must follow for their votes to be counted.

This Disclosure Statement and the Plan have been prepared by the Debtors and their professional advisors.

5732594v1

FOR A DESCRIPTION OF THE PLAN AND VARIOUS RISK AND OTHER FACTORS PERTAINING TO THE PLAN AS IT RELATES TO HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, PLEASE SEE THE SECTIONS ENTITLED "INTRODUCTION AND RECOMMENDATION", "SUMMARY OF THE PLAN" AND "CERTAIN FACTORS TO BE CONSIDERED." ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ANY EXHIBITS AND APPENDICES HERETO CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THE CHAPTER 11 CASES AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION. NOTWITHSTANDING THE FOREGOING, THE DEBTORS, TO THE BEST OF THEIR KNOWLEDGE, BELIEVE THAT THE INFORMATION PRESENTED HEREIN IS TRUE AND ACCURATE.

## III.    THE PLAN VOTING INSTRUCTIONS AND PROCEDURES.

### Definitions.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.

### A.    Notice to Holders of Claims and Holders of Equity Interests.

This Disclosure Statement is being transmitted to certain holders of Claims against the Debtors. The purpose of this Disclosure Statement is to provide adequate information to enable you to make a reasonably informed decision with respect to the Plan prior to exercising your right to vote to accept or reject the Plan.

On _____, 2010,[2] the Court approved this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the holders of Claims against the Debtors to make an informed judgment with respect to acceptance or rejection of the Plan.

---

[2] This date, and all dates which have been left blank in this Disclosure Statement, shall be inserted upon the Court's approval of this Disclosure Statement and the Court's setting of the applicable deadlines and hearing dates.

(Docket No. ___).[3] The Court has scheduled a hearing on the confirmation of the Plan (the "Confirmation Hearing") for _____, 2010 at ___ _.m. (Prevailing Eastern Time).

This Disclosure Statement contains important information about the Plan, considerations pertinent to acceptance or rejection of the Plan, and developments concerning the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.

Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date upon which the Court approves it and that may have a material impact on the information contained in this Disclosure Statement. Further, the Debtors anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date upon which the Court approves the Disclosure Statement.

## B.     Solicitation Package.

Accompanying this Disclosure Statement are copies of (i) the Plan, (ii) the Hearing Notice containing, among other things, the time for submitting Ballots to accept or reject the Plan; the date, time and place of the hearing to consider confirmation of the Plan and related matters; and the time for filing objections to confirmation of the Plan, and (iii) one or more Ballots to be used by you in voting to accept or to reject the Plan, if applicable.

## C.     Voting Procedures, Ballots and Voting Deadline.

After carefully reviewing the Plan, this Disclosure Statement and the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot if you are entitled to vote. If so, then please complete and sign your Ballot and return it by personal service, overnight delivery or United States first-class mail, postage prepaid, to Sullivan & Worcester, LLP, One Post Office Square, Boston, Massachusetts 02109, Attn: Christopher Gosselin (the "Balloting Agent").

---

[3] Unless otherwise indicated, all "Docket No." references set forth in this Disclosure Statement refer to the Bankruptcy Court docket of Global Energy Holdings Group, Inc., Case No. 09-14192 (PJW). On December 3, 2009, the Bankruptcy Court granted the Debtors' Motion for Joint Administration (discussed herein), directing that all pleadings in the bankruptcy cases of Global Energy Holdings Group, Inc. (Case No. 09-14192 (PJW)), Augusta Biofuels, LLC (Case No. 09-14193 (PJW)), Spring Hope Biofuels, LLC (Case No. 09-14195 (PJW)), Xethanol Biofuels, LLC (Case No. 09-14196 (PJW)), and GES – Live Oak Hickory Ride, LLC (Case No. 09-14194 (PJW)), should thereafter be filed in the case of Global Energy Holdings Group, Inc., Case No. 09-14192 (PJW).

4

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT AND <u>RECEIVED</u> NO LATER THAN _____, 2010 at _____ .M. PREVAILING EASTERN TIME (THE "<u>VOTING DEADLINE</u>") AT THE FOLLOWING ADDRESS:

> Sullivan & Worcester LLP
> Attn: Christopher Gosselin, Balloting Agent
> One Post Office Square
> Boston, MA 02109

ANY BALLOT WHICH IS EXECUTED BY THE HOLDER OF AN IMPAIRED ALLOWED CLAIM, BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR AS TO WHICH THE INTENT OF THE HOLDER IS NOT REASONABLY ASCERTAINABLE, SHALL BE DEEMED AN ACCEPTANCE. FOR FURTHER INFORMATION AND INSTRUCTION ON VOTING TO ACCEPT OR REJECT THE PLAN, SEE THE SECTION OF THIS DISCLOSURE STATEMENT ENTITLED "VOTING REQUIREMENTS."

### D. Hearing and Deadline for Objections to Confirmation of Plan.

Pursuant to section 1128 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3017(c), the Court has scheduled the Confirmation Hearing for _____, 2010 at _____ .m. (Prevailing Eastern Time) before the Honorable Peter J. Walsh, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Delaware, 824 North Market Street, 6th Floor, Courtroom #2, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing. The Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Court and served so that they are RECEIVED on or before _____, 2010, at 4:00 p.m. (Prevailing Eastern Time) by: (i) Gayle P. Ehrlich, Esquire, Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts 02109; (ii) Charles J. Brown, III, Esquire, Archer & Greiner, P.C., 300 Delaware Avenue, Suite 1370, Wilmington, DE 19801; (iii) Joseph M. Coleman, Esquire, Kane Russell Coleman & Logan PC, 3700 Thanksgiving Tower, 1601 Elm Street, Dallas, TX 75201; (iv) Michael G. Busenkell, Womble Carlyle Sandridge & Rice, PLLC, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801; and (v) Thomas Patrick Tinker, Office of the United States Trustee, for the District of Delaware, 844 King Street, Suite 2207, Wilmington, DE 19801. Each of those persons (i) through (v) are hereinafter referenced to as the "<u>Notice Parties</u>".

## IV. HISTORY OF THE DEBTORS AND EVENTS LEADING TO BANKRUPTCY.

### A. General Overview of the Debtors.

The Debtors are affiliated entities: Global Energy Holdings Group, Inc ("<u>Global</u>").; Augusta Biofuels, LLC, Spring Hope Biofuels, LLC, Xethanol Biofuels, LLC; and GES – Live

Oak Hickory Ridge, LLC. The Debtors' corporate headquarters are located at, and the mailing address for each Debtor is, P.O. Box 724028, Atlanta, Georgia 31139.

Global is a diversified renewable energy company. Originally incorporated in 2000 in Delaware, with its original principal offices in New York, and stock trading publicly on the NYSE Amex Exchange since 2005, Global has maintained holdings and operations throughout the eastern United States by way of its various subsidiaries and pursued a variety of clean energy projects.

## B. Circumstances Leading to Commencement of the Chapter 11 Case.

In 2008, the Debtors determined to focus operations on the development of renewable energy projects, such as biomass gasification and landfill gas-to-energy projects, and to exit their legacy ethanol business. At this time, the Debtors only source of revenue was from the sale of ethanol and related products at its facility in Blairstown, Iowa (the "Blairstown Facility"). However, a result of high prices for corn and natural gas, Global ceased production of ethanol at the Blairstown Facility on May 1, 2008, to reduce its operating losses.

During the transition, the Debtors faced an increasing liquidity crisis. In early 2009, the Debtors acquired the LFG Contract but were unable to finalize a landfill gas-to-energy project before their liquidity crisis reached a critical state. At the time, the Debtors still owned both the Augusta Facility and the Spring Hope Facility, but neither site could be converted into a successful business enterprise without a significant cash infusion. The Debtors decided that both the Augusta and Spring Hope Facilities did not fit within its long-term corporate strategy and began pursuing the sale of those facilities, a pursuit which remains ongoing.

With the liquidity crisis at critical levels by the fall of 2009 and insufficient cash flow on the horizon, the Debtors determined that it was prudent to file the Chapter 11 Case at this time in order to restructure their business under the protection of the Bankruptcy Court.

## C. Prepetition Legal Disputes.

### 1. *Jacoby Energy Development, Inc., et al. v. Xethanol Corp., et al.*

On July 28, 2008, Jacoby Energy Development, Inc., Geoplasma, LLC and Georecover–Live Oak, LLC (collectively, the "Jacoby Entities") filed an action in the Superior Court of Fulton County of the State of Georgia against Global (then known as Xethanol Corporation), subsidiary Global Energy Systems, Inc. ("GES"), and six then-current officers and employees. The six individual defendants are (i) Romilos Papadopoulos, former Chief Operating Offer, Chief Financial Officer, Executive Vice President and Secretary; (ii) Michael Ellis, former President of GES; and four other employees of GES. The complaint alleges, among other things, that GES breached a mutual nondisclosure agreement related to previous negotiations for a possible merger between GES and the Jacoby Entities. The complaint alleges that GES breached the agreement by soliciting and hiring the six individual defendants, who were previously employed by the Jacoby Entities, and by using the Jacoby Entities' confidential and proprietary information for its own business purposes. The complaint also alleges that GES tortuously interfered with the Jacoby Entities' business and misappropriated the Jacoby Entities' trade secrets. The Jacoby Entities seek, among other things, a permanent injunction, unspecified

compensatory damages, plus costs and expenses incurred in connection with the litigation, including attorneys' fees, and general and punitive damages in an amount not less than $10 million. All defendants have denied the allegations in the complaint, and the individual defendants and GES have asserted counterclaims against the plaintiffs. Pre-petition, GES and the Jacoby Entities refrained from conducting discovery while they attempted to reach a business resolution of the issues. No settlement has been reached. The Jacoby Entities filed a claim(s) in the Chapter 11 Case in the amount of at least $10 million. The Debtors believe based on a due diligence review of the facts asserted by the Jacoby Entities and an understanding of the applicable law that the claims made by the Jacoby Entities are substantially overstated and most likely will be disallowed in whole or in part. The Debtors intend to vigorously defend against such claims and pursue counterclaims.

## V. THE CHAPTER 11 CASE.

On the Petition Date the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to manage their businesses as debtors in possession in accordance with §§ 1107 and 1108.

### A. First Day Motions and Orders Approving Same.

On the Petition Date, the Debtors filed several so-called "first day pleadings", as follows:

- Motion of the Debtors for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (Docket No. 3) (the "Motion for Joint Administration");

- Motion of the Debtors for (I) Authority to Continue Using Existing Cash Management Systems, (II) Authority to Maintain Existing Bank Accounts and Business Forms, and (III) An Extension of the Debtors Time to Comply with Section 345(b) of the Bankruptcy Code, Pursuant to Sections 105(a), 345(b), 363(c) and 364 (a) of the Bankruptcy Code (Docket No. 4) (the "Banking Motion");

- Motion of the Debtors for Interim and Final Orders (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service; (II) Approving the Debtors' Proposed Adequate Assurance; and (III) Approving Procedures for Resolving Requests for Additional Adequate Assurance Pursuant to Sections 105(a) and 366 of the Bankruptcy Code (Docket No. 5) (the "Utilities Motion"); and,

- Motion of the Debtors for an Order Pursuant to Section 105(a) of the Bankruptcy Code, Rule 1007 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 1007-1 Extending the Time to All File Schedules and Statements of Financial Affairs (Docket No. 7) (the "Motion to Extend Time to File Schedules and Statements of Financial Affairs").

  *1.   Joint Administration.*

Pursuant to the Motion for Joint Administration, the Debtors sought Bankruptcy Court authorization for joint administration of their Chapter 11 cases in accordance with Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules for the United States Bankruptcy Court, District of Delaware (the "Local Rules"). On December 3, 2009, the Court entered an order granting the Debtors' motion (Docket No. 20) directing that all pleadings in the bankruptcy case of any of the Debtors should thereafter be filed in the "lead" case of Global Energy Holdings Group, Inc., Case No. 09-14192.

2.     *Extension of Time to File Schedules and Statements of Financial Affairs.*

Pursuant to the Motion to Extend Time to File Schedules and Statements of Financial Affairs, the Debtors sought Bankruptcy Court authorization in accordance with Bankruptcy Rule 1007(c) and Local Rule 1007-1(a) to extend the due date for the Debtors' Schedules and Statements of Financial Affairs from 15 days after the Petition Date to 60 days after the Petition Date. On December 3, 2010, the Court entered an order granting the Debtors' motion, extending the deadline to file Schedules and Statements of Financial Affairs to January 25, 2010 (Docket No. 22).

3.     *Banking and Utilities Motions.*

Pursuant to the Banking Motion, the Debtors sought Bankruptcy Court authorization in accordance with Sections 105(a), 363(c), § 364(a) of the Bankruptcy Code to continue to use their cash management system in a manner consistent with prepetition practices and to maintain their existing bank accounts and business forms. Debtors also sought an extension to comply with Section 345(b) of the Bankruptcy Code. On December 10, 2009 the Court entered an order granting the Debtors' motion (Doc. No. 36).

Pursuant to the Utilities Motion, the Debtors sought interim and final orders of the Bankruptcy Court (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance pending entry of a final order, (ii) approving the Debtors' proposed adequate assurance and (iii) approving the Debtors' proposed procedures for resolving any requests for additional adequate assurance. On December 3, 2009, the Court entered an order granting the Utilities Motion on an interim basis and setting a final hearing on the matter (Docket No. 21). On December 14, 2009, the Court entered a final order (i) prohibiting utility companies from altering, refusing, or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts outstanding (ii) approving the Debtors' proposed adequate assurance of $5,000 and (iii) approving the Debtors' proposed procedures for resolving any requests for additional adequate assurance (Docket No. 41).

**B.     Filing of Required Documents.**

On January 1, 2010, the Debtors each filed an amended petition which included all required schedules and statements of financial affairs (Docket Nos. 66-70). Each month the Debtors filed monthly operating reports as required by the United States Trustee for the District of Delaware.

**C.      Appointment of Debtors' Professionals.**

The Debtors filed applications to employ the following professionals, each of which the Court approved:

- Application of the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for Authorization to Employ and Retain Sullivan & Worcester LLP as Attorneys for the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 13) (the "Application to Employ Counsel");

- Application of the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code for Authorization to Employ and Retain Archer & Greiner, P.C. as Attorneys for the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 11) (the "Application to Employ Local Counsel");

- Application of the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a) for Authorization to Employ and Retain Allomet Partners LLC as Restructuring Officer *Nunc Pro Tunc* to the Petition Date (Docket No. 12) (the "Application to Employ Restructuring Officer");

- Application of the Debtors Pursuant to Sections 327(e), 328(a) and 1107 of the Bankruptcy Code and Bankruptcy Rule 2014 for Authorization to Employ and Retain Sutherland Asbill & Brennan LLP as Special Counsel to the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 33) (the "Application to Employ Securities Counsel");

- Application of the Debtors Pursuant to Sections 327(e), 328(a) and 1107 of the Bankruptcy Code and Bankruptcy Rule 2014 for Authorization to Employ and Retain Randall D. Quintrell, P.C. as Special Counsel to the Debtors, *Nunc Pro Tunc* to the Petition Date (Docket No. 35) (the "Application to Employ Environmental and Regulatory Counsel");

- Application Pursuant to Sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1 for an Order Authorizing the Debtors to Retain and Employ Grubb & Ellis Company as Real Estate Broker *Nunc Pro Tunc* to March 31, 2010 (Docket No. 179) (the "Application to Employ Broker"); and

- Application Pursuant to Sections 327(a) and 330 of the Bankruptcy Code, Bankruptcy Rule 2014 and Local Rule 2014-1 for an Order Authorizing the Debtors to Retain and Employ Blue Ridge Strategies as Real Estate Broker *Nunc Pro Tunc* to April 13, 2010 (Docket No. 186) (the "Application to Employ Blue Ridge").

   *1.      Bankruptcy Counsel.*

On the Petition Date, the Debtors selected and engaged Sullivan & Worcester LLP ("S&W") to act as bankruptcy counsel on their behalf. Debtors selected S&W based on its experience and knowledge in the field of bankruptcy law. For this reason, the Debtors believed that S&W was well-qualified to represent them in the Chapter 11 Case.

The Court entered an order granting the Application to Employ Counsel (Docket No. 57) on December 23, 2009, *nunc pro tunc* to the Petition Date. Sullivan & Worcester LLP was thereby authorized to advise the Debtors of their rights, powers, and duties as debtors and debtors-in-possession; prepare on behalf of the Debtors all necessary motions, applications, answers, orders, reports, and papers in connection with the administration of the Estate; and to perform all other necessary legal services in connection with the Chapter 11 Case as more fully set forth in the Application to Employ Counsel.

2.      *Local Counsel.*

On the Petition Date, the Debtors selected and engaged Archer & Greiner, P.C. ("Local Counsel") to act as local bankruptcy counsel on their behalf. Debtors selected Local Counsel based on its experience and knowledge in the field of bankruptcy law. For this reason, the Debtors believed that Local Counsel was well-qualified to represent them in the Chapter 11 Case.

The Court entered an order granting the Application to Employ Local Counsel (Docket No. 54) on December 23, 2009, *nunc pro tunc* to the Petition Date. Archer & Greiner, P.C. was thereby authorized to advise the Debtors of their rights, powers, and duties as debtors and debtors-in-possession; to assist S&W in the preparation on behalf of the Debtors of all necessary motions, applications, answers, orders, reports, and papers in connection with the administration of the Estate; and to perform all other necessary legal services in connection with the Chapter 11 Case as more fully set forth in the Application to Employ Local Counsel.

3.      *Restructuring Officer.*

Prior to the Petition Date, in September 2009, the Debtors selected and engaged Allomet Partners LLC ("Allomet") to provide restructuring advisory services in response to growing liquidity issues. During those months prior to the Petition Date, Allomet became well-acquainted with the Debtors' businesses, capital structure and financial affairs. Due to Allomet's familiarity with the Debtors' businesses, as well as Allomet's general experience in providing restructuring advisory services, the Debtors believed that the firm was well-qualified to represent them in the Chapter 11 Case.

The Court entered an order granting the Application to Employ Restructuring Officer (Docket No. 93) on February 24, 2010, *nunc pro tunc* to the Petition Date. Allomet was thereby authorized to provide the Debtors with restructuring advisory services in connection with the Chapter 11 Case; and Allomet's principal, Gary Brooks, was authorized to act as Restructuring Officer.

4.      *Securities Counsel.*

On December 8, 2009, the Debtors selected and engaged Sutherland Asbill & Brennan LLP ("Sutherland") to act as special counsel on certain securities and transactional matters. Debtors selected Sutherland based on its experience and knowledge in the fields of securities and transactional law. For this reason, the Debtors believed that Sutherland was well-qualified to represent them in the Chapter 11 Case.

The Court entered an Order granting the Application to Employ Securities Counsel (Docket No. 55) on December 23, 2009, *nunc pro tunc* to the Petition Date. Sutherland was thereby authorized to provide the Debtors with counsel on certain securities and transactional matters, as more fully set forth in the Application to Employ Securities Counsel.

### 5. *Environmental and Regulatory Counsel.*

On December 8, 2009, the Debtors selected and engaged Randall D. Quintrell, P.C. ("Quintrell") to act as special counsel on certain environmental and regulatory matters. Debtors selected Quintrell based on its experience and knowledge in the fields of environmental and regulatory law. For this reason, the Debtors believed that Quintrell was well-qualified to represent them in the Chapter 11 Case.

The Court entered an Order granting the Application to Employ Environmental and Regulatory Counsel (Docket No. 56) on December 23, 2009, *nunc pro tunc* to the Petition Date. Quintrell was thereby authorized to provide the Debtors with counsel on certain environmental and regulatory matters, as more fully set forth in the Application to Employ Securities Counsel. Quintrell has also acted as the point of contact for the Debtors with respect to sought after sales of the LFG Contract, the Augusta Facility and the Spring Hope Facility.

### 6. *Application to Employ Broker.*

On March 31, 2010, the Debtors selected and engaged Grubb & Ellis Company ("G&E") to act as real estate broker in connection with the sought after sales of the Augusta Facility and the Spring Hope Facility. Debtors selected G&E based on its knowledge and experience in marketing similar properties for sale throughout the areas where both facilities are located. For this reason, the Debtors believed that G&E was well qualified to represent them as real estate broker in these transactions.

The Court entered an order granting the Application to Employ Broker (Docket No. 200) on May 21, 2010, *nunc pro tunc* to March 31, 2010. G&E was thereby authorized to act as the Debtors' real estate broker in connection with the sought after sales of the Augusta Facility and the Spring Hope Facility, as more fully set forth in the Application to Employ Broker.

### 7. *Application to Employ Blue Ridge.*

On April 13, 2010, the Debtors selected and engaged Blue Ridge Strategies, LLC ("Blue Ridge") to act as real estate broker in connection with a sought after sale of the Augusta Facility to Bunge Limited. Debtors selected Blue Ridge to act as real estate broker with regard to a potential sale of the Augusta Facility to Bunge Limited because Blue Ridge had been cultivating a relationship with Bunge Limited since July of 2009. For this reason, the Debtors believed that

11

Blue Ridge was well qualified to represent them as real estate broker with regard to the possible sale of the Augusta Facility to Bunge Limited.

The Court entered an order granting the Application to Employ Blue Ridge (Docket No. 202) on May 21, 2010, *nunc pro tunc* to April 13, 2010. Blue Ridge was thereby authorized to act as the Debtors' real estate broker in connection with the sought after sales of the Augusta Facility to Bunge Limited, as more fully set forth in the Application to Employ Blue Ridge.

### D. Appointment of a Creditors' Committee.

On February 3, 2010, the United States Trustee appointed the following creditors to serve on the Creditors' Committee in the Chapter 11 Case (Docket No. 81):

- Gary Klein

- The Legacy Group

- Weinberg, Wheeler, Hudgins, Gunn & Dial, LLC

On May 7, 2010, the United States Trustee amended the list of creditors appointed to serve on the Creditors' Committee in Chapter 11 Case, appointing the following creditors (Doc. No. 188):

- The Legacy Group

- Nelson Mullins Riley & Scarborough

- William D. Haynes

On March 5, 2010, the Creditors' Committee filed an Application for Entry of an Order Approving the Employment and Retention of Womble Carlyle Sandridge & Rice, PLLC as Local Counsel for the Official Committee of Unsecured Creditors *Nunc Pro Tunc* to February 25, 2010 (Docket No. 103), and an Application for Order Authorizing the Employment of Kane Russell Coleman & Logan PC as Attorneys for the Official Committee of Unsecured Creditors (Docket No. 104). The Court granted both applications on March 22, 2010 (Docket Nos. 132-133).

### E. Efforts to Sell Property.

Since the Petition Date, the Debtors considered various short and long-term strategies with respect to its Property. The Debtors, using their business judgment to pursue a disposition of its Property, have engaged in prepetition and postpetition marketing of its Property to ascertain the highest and best value.

In early March 2010, the Debtors entered into an Assignment Agreement (the "First MAS Agreement") with MAS Energy, LLC ("MAS") who had agreed to act as the stalking horse bidder in regard to the Debtors' rights under a contract which grants the Debtors the right to purchase all of the landfill gas generated at the Hickory Ridge Landfill in Conley (DeKalb County), Georgia (the "LFG Contract"), following which the Debtors filed with the Court

Debtors' Motion for Orders (I) Approving Bid Procedures in Advance of Auction for Sale of Landfill Gas Contract Rights; (II) Setting a Final Hearing for Approval of the Sale; (III) Approving the Sale Free and Clear of All Liens, Claims, Encumbrances, and other Interests; (IV) Making Section 363(m) and 363(n) Findings in Favor of Purchaser; and (V) Granting Related Relief (Docket No. 110) (the "Bid Procedures and Auction Motion"). The First MAS Agreement provided at Section 4.4 that MAS could terminate the First MAS Agreement based on due diligence review. On April 19, 2010, MAS notified the Debtors that it was exercising its termination rights as a result of certain permitting issues particular to MAS' use of the site.

Subsequent to MAS exercising its termination rights under the First MAS Agreement, the Debtors, with approval of the Creditors' Committee, solicited the LFG Contract to all known, potential bidders. Debtors sought a minimum offer of $2,000,000 in cash and informed all potential bidders that they would proceed with a sale to the first bidder to offer the minimum required amount. While the solicitation process initially resulted only in offers below the minimum target amount, on June 17, 2010, MAS tendered an essentially unconditional offer of $2,000,000 in cash to purchase the LFG Contract. Debtors entered into a second Assignment Agreement with MAS (the "Second MAS Agreement"), and intend to file a motion for sale of the LFG Contract in accordance with Section 363 of the Bankruptcy Code shortly after the filing of this Disclosure Statement.

### F.     Change of Venue.

On March 19, 2010, the Jacoby Entities filed a Motion to Transfer Venue of the Chapter 11 Case to the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (Docket No. 127) (the "Motion to Change Venue"). Objections were filed to the Motion to Change Venue by creditor David Ames (Docket No. 147) on April 1, 2010 and both the Creditors' Committee (Docket No. 150), and the Debtors (Docket No. 151) on April 6, 2010. The Court issued an order on denying the Motion to Change Venue (Docket No. 155) on April 9, 2010, after hearing oral argument on the matter.

### G.     Settlement with Landlord.

Prior to the Petition Date, Debtors entered into a certain office lease agreement dated on or about April 24, 2007, as amended on or about September 9, 2008 (the "Office Lease"), and to a storage space lease dated on or about August 1, 2008 (together with the Office Lease, the "Lease") pertaining to office space and storage space located in an office tower owned and operated by the Landlord and located at Tower Place 200, 3348 Peachtree Road NE, Suite 200, Suite 250, and Cage #1 Atlanta, Georgia 30326 (the "Premises"). At the time the Lease was amended, the Debtors exercised an option which extended the term of the Lease through until February 28, 2014. However, as of the Petition Date, the Debtors had vacated the space, leaving behind certain files and assorted office furnishings.

In early 2010, the Debtors entered into settlement discussions with their landlord (the "Settlement Agreement"), out of which came a settlement agreement which was filed with the Court, along with a motion seeking approval of the settlement agreement (Docket No. 180) (the "Motion to Approve Settlement") on April 28, 2010. The Court issued an order granting the Motion to Approve Settlement (Docket No. 201) on May 21, 2010, thereby approving the

Settlement Agreement. Pursuant to the Settlement Agreement, the Debtors filed a notice of rejection of the Lease (Docket No. 211), removed their files and one piece of office equipment from the Premises, and abandoned the remaining office furniture into the landlord's possession. In exchange, the landlord released all claims against the Debtors' estates, which the Debtors estimated could have been as high as approximately $450,000.

### H.    General Claims Bar Date.

On March 15, 2010, the Debtors moved the Bankruptcy Court seeking to establish a "bar date," or deadline, for holders of claims against the Debtors to file proofs of claim (Docket No. 113). An order granting the Debtors' request was entered by the Court on April 22, 2010 (Docket No. 170) (the "Bar Date Order"). Pursuant to the Bar Date Order, the Debtors established June 15, 2010 as the bar date for all entities, including governmental units, to file proofs of claim ("Bar Date").

The Debtors' counsel sent notice of the Bar Date to the Debtors' known creditors by United States first class mail, postage prepaid, on April 23, 2010, and provided notice to certain creditors via the Court's Electronic Case Filing service, all as reflected in their certificate of service filed with the Court on April 26, 2010 (Docket No. 175).

If after payment in full of all Class 1 Claims in the Liquidating Trustee's reasonable opinion the Liquidating Trust holds Property of sufficient value to allow for a 5% distribution to holders of Class 2 Claims, then the Liquidating Trustee shall file a motion requesting that the Bankruptcy Court issue an order establishing a bar date for the filing of proofs of Equity Interest, as well a related objection deadline and allowance procedures for Class 2 Claims.

### I.    Filing of Initial Plan and Related Disclosure Statement.

On June 29, 2010, the Debtors filed with the Bankruptcy Court the Motion of Debtors for an Order (i) Granting Approval of the Disclosure Statement; (ii) Establishing Voting Record Holder Date; (iii) Approving Solicitation Procedures, Form of Ballot and Manner of Notice; (iv) Establishing a Voting Deadline; (v) Establishing Deadline for Filing Objections to Confirmation of Plan; (vi) Scheduling Plan Confirmation Hearing and (vii) Granting Related Relief (Docket ____) and the Plan.

### J.    Approval of this Disclosure Statement.

On _____, 2010, the Court approved this Disclosure Statement as providing adequate information within the meaning of § 1125(a)(1) of the Bankruptcy Code (Docket No. ___) (the "Order Approving Disclosure Statement and Establishing Confirmation Procedures"). As a result of the Court's approval of this Disclosure Statement, the Debtors were statutorily authorized to solicit votes accepting or rejecting the Plan.

Parties may object to confirmation of the Plan pursuant to the terms and conditions of the Order Approving Disclosure Statement and Establishing Confirmation Procedures.

5732594v1

## VI.    SUMMARY OF THE PLAN.

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, TREATMENT AND IMPLEMENTATION OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO ANY EXHIBITS AND APPENDICES ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE OR WILL HAVE BEEN FILED PRIOR TO THE HEARING ON APPROVAL OF THIS DISCLOSURE STATEMENT, WILL CONTROL THE TREATMENT OF CREDITORS AND EQUITY SECURITY HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND OTHER PARTIES-IN-INTEREST.

### A.    Classification and Treatment of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code requires that a plan of reorganization or liquidation classify the claims of a debtor's creditors and the interests of its equity holders.  The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization or liquidation may place a claim of a creditor or an interest of an equity holder in a particular Class only if such claim or interest is substantially similar to the other claims or interests of such Class.  The Plan creates two separate Classes: Class 1 - General Unsecured Claims; and Class 2 - Equity Interests.

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the requirements of section 1122 of the Bankruptcy Code.  If a Creditor or Equity Interest holder challenges such classification of Claims or Equity Interests and the Court finds that a different classification is required for the Plan to be confirmed, the Debtors, to the extent permitted by the Court, intend to make such reasonable modifications to classifications of Claims or Equity Interests under the Plan as may be necessary or appropriate to provide for whatever classification might be required by the Court for confirmation. EXCEPT TO THE EXTENT THAT SUCH MODIFICATION OF CLASSIFICATION ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM OR EQUITY INTEREST AND REQUIRES RESOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER IS ULTIMATELY DEEMED TO BE A MEMBER.

The Bankruptcy Code also requires that a plan of reorganization or liquidation provide the same treatment for each claim or interest of a particular Class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest. The Debtors believe that they have complied with such standard. If the Court finds otherwise, it could deny confirmation of the Plan if the holders of Claims affected do not consent to the treatment afforded them under the Plan.

**Unless expressly provided for in the Plan, interest shall neither accrue nor be paid on any Claim.**

## B. General Unsecured Claims.

*1. Class 1 – General Unsecured Claims.*

**a. Description of Class 1. Class 1 consists of General Unsecured Claims, including, without limitation, any and all unsecured trade, contribution, indemnification, reimbursement, employee contract and lease and contract rejection Claims against the Debtors (if any).**

As of the Petition Date, the Debtors estimated that unsecured nonpriority Claims against the Estate totaled approximately $33 million (collectively, the "Scheduled Claims"). As of the General Claims Bar Date, 71 proofs of claim (the "Filed Claims") had been timely filed which collectively asserted amounts owed by the Debtors of approximately $14.52 million. Certain of the Filed Claims allege secured, administrative and/or priority status for such Claims, and thus (to the extent not waived, released, compromised or settled pursuant to the Plan) may not constitute General Unsecured Claims. Certain Filed Claims may be duplicative in that they were filed as claims against more than one Debtor. Additionally, (i) certain of the Filed Claims supersede the Scheduled Claims, and (ii) certain of the Filed Claims may be disputed or may be resolved under the Plan. Further, the Estate may have Causes of Action against the holders of certain Claims, which can be set off against such Claims. Based on the Debtors' analysis of the Filed Claims and the Scheduled Claims (after subtracting duplicate Filed Claims, and Scheduled Claims that were listed as disputed, contingent or unliquidated and for which no proof of claim was timely filed), the Debtors estimate that General Unsecured Claims total approximately $4.2 million. The Debtors, on behalf of themselves, the Estate and any successor (including the Liquidating Trustee) expressly reserve the right to challenge and object to any and all of the Filed Claims or to further amend the Schedules to dispute Scheduled Claims, and accordingly, the aggregate amount of Allowed Class 1 Claims may be lower than the aggregate amount of General Unsecured Claims.

**b. Impairment and Voting. Class 1 is impaired under the Plan. The holder of a Class 1 Claim is entitled to vote to accept or reject the Plan.**

**c. Treatment and Distributions. On the later of (i) the Initial Distribution Date and (ii) the next Subsequent Distribution Date after which any Class 1 Claim becomes an Allowed Class 1 Claim, the Liquidating Trustee shall cause each holder of an Allowed Class 1 Claim to receive in Cash, an amount equal to that holder's pro rata share of the then available**

**Class 1 Distribution Amount. The holder of any Avoidance Action Unsecured Claim shall receive the same treatment as all the holders of all other Allowed Class 1 Claims and shall be paid out the proceeds of any Avoidance Action Cause of Action. Any Distribution to which a holder of a Class 1 Claim is or shall become entitled is subject in all events to any rights of setoff or recoupment that may be asserted by or on behalf of the Liquidating Trust, including on account of any Causes of Action, or on account of sections 502(d), 510 or 549 of the Bankruptcy Code.**

Due to various rights, objections and counterclaims that the Debtors (and their respective successors, including the Liquidating Trustee) may assert in connection with certain of the General Unsecured Claims, the Debtors are unable to estimate the amount of Allowed Class 1 Claims, although they reasonably believe that that figure will not exceed $3.5 - $4.0 million. The Debtors anticipate that holders of Allowed Class 1 Claims will receive a distribution of approximately 70 – 100% of their Allowed Claims, plus additional amounts (if any) that may be recovered by the Liquidating Trustee on behalf of the Liquidating Trust from the Liquidating Trust Assets that pass to the Trust under the Plan.

**C.      Equity Interests.**

**a.      Description of Class 2. Class 2 consists of the holders of Equity Interests in the Debtors.**

**b.      Impairment and Voting. Class 2 is unimpaired and is deemed to have accepted the Plan pursuant to § 1126(f) of the Bankruptcy Code.**

**c.      Treatment and Distributions. The holders of Class 2 Equity Interests will receive only such funds as remain after payment of 100% of all of Allowed Class 1 Claims. Such Equity Interests shall be extinguished as of the Effective Date.**

**D.      Unclassified Claims – Administrative Expense Claims and Priority Claims.**

*1.      Administrative Expense Claims.*

Unless previously satisfied, except to the extent that the holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise set forth in the Plan, and subject to the Administrative Expense Claims Bar Date set forth in the Plan, holders of Allowed Administrative Expense Claims shall be paid in full, in Cash, on the later of (i) ten (10) Business Days following the Effective Date, (ii) within ten (10) Business Days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim and (iii) the date such Allowed Administrative Expense Claim becomes due according to its terms.

Unless previously satisfied, on the Effective Date or as soon thereafter as is practicable, the Debtors or the Liquidating Trustee shall pay or have paid in Cash in full all (i) Allowed Administrative Expense Claims for fees payable pursuant to 28 U.S.C. § 1930 and fees payable to the Court, which are due and payable on or before the Effective Date; and (ii) Professional

Fees and Expenses as allowed by Final Order of the Bankruptcy Court. All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the Liquidating Trust.

### 2. *Priority Claims.*

Except to the extent that the holders of Allowed Priority Claims agree to a different treatment, such holders shall receive the amount of such Allowed Priority Claim in full, in cash, on the later of (i) within ten (10) Business Days following the Effective Date, or (ii) ten (10) Business Days after the date such Priority Claim becomes an Allowed Priority Claim.

The Debtors, on behalf of themselves, the Estate and any successor (including the Liquidating Trustee) expressly reserve the right to challenge and object to the priority and amount of alleged Priority Claims.

## VII. PROVISIONS FOR THE EXECUTION AND IMPLEMENTATION OF THE PLAN.

### A. Substantive Consolidation

#### 1. *Consolidation of the Chapter 11 Case and the Estate.*

The Plan contemplates and is predicated upon entry of an order substantively consolidating the Debtors' estates into the Estate and their respective Chapter 11 bankruptcy cases into the Chapter 11 Case for the purposes of all actions associated with confirmation and consummation of the Plan and Plan Distributions. On the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date, and for the purposes set forth above, (i) all Intercompany Claims, for purposes of determining distributions from the Estate as provided under the Plan, shall be eliminated; (ii) any obligation of a Debtor and all guarantees thereof by the other Debtor or any joint or joint and several liability of the Debtors with one another shall be deemed to be one obligation of the Debtors and shall be deemed a single Claim against and a single obligation of the Debtors, and (iii) all duplicative Claims identical in amount and subject matter filed against more than one Debtor shall be automatically expunged so that only one Claim survives against the consolidated Debtors. On the Effective Date, and in accordance with the terms of the Plan and the substantive consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor shall be disallowed, expunged and of no further force and effect. The substantive consolidation of the assets and liabilities of the Debtors shall not result in any actual transfer or merger of such assets and liabilities for any purpose (including, without limitation, for tax purposes and state law purposes) other than the administration of the Chapter 11 Case and the determination of the rights of holders of Claims and Equity Interests under the Plan and the making of Plan Distributions.

#### 2. *Substantive Consolidation is a Predicate to the Plan.*

The overriding purpose of substantive consolidation of the Cases is to ensure the equitable treatment of all holders of Claims. While, as a technical matter, certain holders of Claims might receive a lesser distribution of Cash pursuant to the Plan as a result of the pooling

of assets of the Debtors than might otherwise be available if the Debtors' chapter 11 cases were not substantively consolidated, the Debtors have determined, after diligent inquiry and analysis, that the segregation and allocation of assets and liabilities between the Debtor entities necessary to effectuate a distribution to creditors on an unconsolidated basis would be virtually impossible and prohibitively expensive given the complexity of intercompany transactions, the unity of interests and historical commingling of assets and business functions of the Debtors. Due to these factors, the Debtors cannot provide holders of Claims with a comparative analysis of what such holders would otherwise receive without substantive consolidation. Based on the foregoing, the Debtors believe that substantive consolidation is warranted in these circumstances and intend to demonstrate the need for substantive consolidation at the Confirmation Hearing.

### 3.    *Substantive Consolidation Order.*

Unless the Bankruptcy Court has approved the substantive consolidation of the assets and liabilities of the Debtors by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the assets and liabilities of the Debtors. If no objection to substantive consolidation is timely filed and served by any holder of a Claim that is impaired within the meaning of section 1124 of the Bankruptcy Code as provided herein, on or before the deadline for objecting to the Plan or such other date as may be established by the Bankruptcy Court, an order granting the relief requested in this section VII.A (which may be the Confirmation Order) may be entered by the Bankruptcy Court. If any such objections are timely filed and served, a hearing with respect to the substantive consolidation of the assets and liabilities of the Debtors and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing, provided that it occurs at or prior to confirmation of the Plan.

## B.    **Sale of Property.**

### 1.    *The Sale Transactions.*

The Plan is generally predicated upon the Debtors' sale of its Property. The net cash proceeds of any of the sale transactions, after deduction of reasonable and customary closing costs, will be used to pay Allowed Claims of creditors. In accordance with applicable bankruptcy priorities, the net cash proceeds will be used to pay, in the following order, Allowed Administrative Expense Claims, costs of administering the Liquidating Trust, Allowed Priority Claims, and Allowed General Unsecured (Class 1) Claims. The balance of the net cash proceeds will be used to pay Allowed Equity (Class 2 ) Claims.

### 2.    *Description of Property Available for Sale.*

The Debtors own the following Property:

### a.    **Real Property.**

- A former pharmaceutical manufacturing complex located at 1736 Lovers Lane, Augusta, Georgia (the "Augusta Facility"). The Augusta Facility consists of

multiple buildings on 40.8 acres. It was purchased by the Debtors in August 2006.

- A former medium density fiberboard plant 158 South Old Franklin Road, Spring Hope, North Carolina (the "Spring Hope Facility"). The Spring Hope Facility consists of 200,000 square feet of factory building on 212 acres. The Spring Hope Facility was purchased by the Debtors in November 2006 in connection with the acquisition of Carolina Fiberboard Corporation, LLC.

### b.    Personal Property.

- The LFG Contract, which contract grants the Debtors the right to purchase all of the landfill gas generated at the Hickory Ridge Landfill in Conley (DeKalb County), Georgia. Debtors, specifically GES Live Oak – Hickory Ridge, LLC, entered into the LFG Contract in November, 2008, with BFI Waste Management Systems of North America, LLC, a subsidiary of Republic Services, Inc.

- A minority ownership interest in Carbon Motors Corporation, an American automaker developing a specially-built law enforcement vehicle featuring a clean diesel engine that can run on biodiesel fuel. The Debtors own 200,000 shares of Series B Preferred Stock and a warrant that is initially exercisable for 30,000 shares of Series B Preferred Stock at a price of $1.05 per share with a term of five years.

- Miscellaneous equipment of de minimis value located at the Augusta Facility.

The Debtors contemplate that, prior to the Confirmation Hearing, the Debtors may sell, pursuant to Section 363 of the Bankruptcy Code, certain of the Property. The Debtors anticipate that it may be financially beneficial to wait up to three years to liquidate its holdings in Carbon Motors Corporation.

### 3.    *Implementation of Bankruptcy Code § 1146(a).*

All transfers or other transactions that occur pursuant to or in connection with the Plan or the Confirmation Order shall not be taxed under any federal, State, or local law imposing a stamp tax, Real Property transfer tax, recording tax, or similar tax.

### C.    Corporate Action.

On the later of the Effective Date and the Closing Date, the Debtors shall be deemed dissolved without any requirement of further action by the stockholders, directors, or members of the Debtors.

### D.    Establishment of Liquidating Trust / Vesting of Assets.

On the Effective Date, the Liquidating Trust shall be established pursuant to the terms of the Liquidating Trust Agreement, including the creation of the Liquidating Trust Assets as set forth in Article III of the Plan.

20

1. *Liquidating Trust Assets.*

On the Effective Date, (i) the Debtors shall be deemed to have transferred or assigned the Causes of Action to the Liquidating Trust (if and to the extent that such Causes of Action have not been waived, released, compromised, settled or abandoned pursuant to the Plan) and the Liquidating Trustee shall be deemed substituted for the Debtors in any pending Causes of Action; and (ii) all other Remaining Assets shall be transferred or assigned to the Liquidating Trust in such form as is reasonable acceptable to the Liquidating Trustee.

Except as otherwise provided in the Plan, all Remaining Assets of the Debtors that vest in the Liquidating Trust shall be free and clear of all Claims, Liens, encumbrances, and other interests of creditors and holders of Equity Interests.

Cash held in the Liquidating Trust shall, to the greatest extent practicable, be invested by the Liquidating Trustee in interest-bearing certificates of deposit and interest-bearing accounts to be established in one or more depository banks that are qualified to hold deposits of bankruptcy estates. All interest earned on such Cash shall be property of the Liquidating Trust.

2. *Appointment and Responsibilities of Liquidating Trustee.*

On or prior to the Effective Date, Robert L. Franklin shall be appointed and shall accept an appointment as Liquidating Trustee. On the Effective Date, the Liquidating Trustee shall assume all of the fiduciary responsibilities, duties and obligations of the Liquidating Trust and shall be empowered and authorized to satisfy such responsibilities, duties and obligations without further authority from the Court.

Robert L. Franklin is a career investment banker, who has served on numerous corporate and not-for-profit boards of directors. On the Global board, he is a member of the executive committee, the audit committee, and chairman of the venture, science and technology committee. He is also a member of the Global board's special committee overseeing the company's progress as debtor in possession.

In 2005, Mr. Franklin was a founder of Ariel Savannah Angel Partners LLC ("ASAP"), which makes angel risk investments for its members from Savannah, Hilton Head and other Low Country communities. From 2005 to 2009, he was chairman and CEO of the managing member of ASAP. In January of 2009, he was elected chairman emeritus, and continues as a board member and a member of ASAP. In December of 2009, Mr. Franklin and others founded the Global Angel Investor Network (GAIN), where he will serve as chairman of the board.

In July 2003, Mr. Franklin was appointed by Massachusetts Governor Mitt Romney as a member of the Massachusetts Public Education Nomination Council, on which he served until February 2005. In 2003, he was vice chairman, and in 2004 he was chairman of that Council. From 1994 to 1999, he was a trustee of the Massachusetts Maritime Academy, a four-year state college. In November 2004, he joined the Advisory Board of the Institute for Effective Governance, a Washington, D.C. service organization for responsible trustees.

From 1998 to 2001, he was a member of the Advisory Board of Directors of the Association of the United States Army. In June of 2004, Mr. Franklin completed a term as a

director of Berthel Fisher & Company, a diversified financial services company headquartered in Cedar Rapids, Iowa.

Ariel Savannah Angel Partners LLC holds a minority interest in Carbon Motors Corporation.

The powers of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the power to (i) invest funds; (ii) make Distributions to holders of Allowed Claims and Allowed Administrative Expense Claims; (iii) pay taxes and other obligations owed by the Liquidating Trust or incurred by the Liquidating Trustee; (iv) engage and compensate from the Liquidating Trust Assets consultants, agents, employees, and professional persons (including, without limitation, attorneys) to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities; (v) liquidate and dispose of the Liquidating Trust Assets; (vi) compromise and settle Claims and causes of actions; (vii) act on behalf of the Debtors and the Estate in all adversary proceedings and contested matters (including, without limitation, the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (viii) commence and/or pursue any and all actions involving Liquidating Trust Assets that could arise or be asserted at any time, unless otherwise waived or relinquished in the Plan; (ix) utilize Liquidating Trust Assets to purchase appropriate insurance to insure the acts and omissions of the Liquidating Trustee; (x) prepare and file tax returns (if and as applicable); (xi) prepare and submit quarterly United States Trustee reports after the Effective Date; (xii) pay quarterly United States Trustee fees due after the Effective Date; (xiii) file a motion for Final Decree; and (xiv) act and implement the Plan, the Liquidating Trustee, and orders of the Bankruptcy Court. The Liquidating Trustee shall exercise such powers in accordance with the provisions of the Plan and the Liquidating Trust Agreement.

The Liquidating Trustee shall be the exclusive trustee of the Liquidating Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to § 1123(b)(3)(B) of the Bankruptcy Code.

### 3. *Authority to Retain Agents and Professionals.*

The Liquidating Trustee may hire such attorneys, accountants, escrow agents and other professionals as may be required to represent the Liquidating Trustee in his or her discretion. The reasonable fees and expenses of the professionals retained by the Liquidating Trustee will be paid by the Liquidating Trustee from the Liquidating Trust Assets without necessity of any court order. Persons who served as Professionals to the Debtors prior to the Effective Date may represent or serve as the Liquidating Trustee.

### 4. *Liability of Liquidating Trustee and Agents.*

The Liquidating Trustee and any professionals retained by him or her shall not be liable or answerable for anything in connection with the Plan except for willful misconduct or gross negligence. The Liquidating Trustee shall be entitled to rely upon any opinion of counsel and other professionals employed by the Liquidating Trustee and shall not be liable for any action taken or omitted in good faith on such reliance.

### 5. *Compensation.*

5732594v1

As set forth in the Liquidating Trust Agreement, the Liquidating Trustee shall receive reasonable compensation payable from Liquidating Trust Assets for his or her services. The Liquidating Trustee shall also be reimbursed from the Liquidating Trust Assets for any expenses reasonably incurred in the performance of his or her duties. The Liquidating Trustee may pay any such compensation or expenses without necessity of any court order.

6. *Replacement of Liquidating Trustee.*

In the event of a vacancy by reason of the death or removal of the Liquidating Trustee or prospective vacancy by reason of resignation, the Bankruptcy Court, after notice and a hearing, shall appoint a successor Liquidating Trustee. Every successor Liquidating Trustee appointed hereunder shall execute, acknowledge, and deliver to the Trust, the Bankruptcy Court, and the retiring Liquidating Trustee, if any, an instrument accepting such appointment subject to the terms and provisions hereof. The successor Liquidating Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Liquidating Trustee, except that the successor Trustee shall not be liable for the acts or omissions of the retiring Liquidating Trustee.

7. *Escrow Agent.*

On the Effective Date, the Liquidating Trustee shall engage _____ (the "Escrow Agent") to hold Available Cash and net proceeds from the liquidation of Remaining Assets. The Escrow Agent, under the direction of the Liquidating Trustee, shall maintain records of all Allowed Claim holders make all Distributions and payments on behalf of the Liquidating Trust.

8. *Tax Information and Transfer of Assets.*

**a.** **Generally.** **The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as a deemed transfer to the Liquidating Trust Beneficiaries by the Estate, of any rights that they may have in and/or to prosecute the Liquidating Trust Assets, followed by a deemed transfer by the Liquidating Trust Beneficiaries to the Liquidating Trust. The Liquidating Trust Beneficiaries shall be treated as the grantors and deemed owners of the trust assets that they are deemed to transfer to the Liquidating Trust. Whether or not the Liquidating Trustee establishes reserves to pay future expenses, all Liquidating Trust income shall be treated as subject to tax on a current basis. The Liquidating Trustees shall allocate the Liquidating Trust income for each taxable year among the Liquidating Trust Beneficiaries in accordance with their respective interest in the Liquidating Trust, as determined from time to time by the Liquidating Trustee, and the Liquidating Trust Beneficiaries shall be responsible for any tax liability that results from said income.**

**b.** **IRS Form W-9 and Disallowance of Claim Upon Failure to Provide Form Upon Request. Each Liquidating Trust Beneficiary shall be required, before any distribution of Liquidating Trust Assets is made to such**

**Person, to provide the Liquidating Trustee with an executed IRS Form W-9 or such other appropriate taxpayer identification information, to allow the Liquidating Trustee to file the appropriate tax return on behalf of the Liquidating Trust. If a Liquidating Trust Beneficiary shall fail to provide the Liquidating Trustee with any requested taxpayer identification information within 90 days after a request for this information, this failure shall be deemed a waiver of all claims against the Liquidating Trust, including the right to Distributions, and the funds that would otherwise have been distributed to such holder shall revert to the Liquidating Trust to be distributed to other beneficiaries who have provided the requested taxpayer identification information. The Liquidating Trustee shall execute and file tax returns on behalf of the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a).**

9.     *Closing of the Chapter 11 Case; Termination of Liquidating Trust.*

The Liquidating Trustee may seek entry of an order closing the Chapter 11 Case after the Liquidating Trust Assets are fully administered in accordance with Bankruptcy Rule 3022.

Upon administration of the Liquidating Trust Assets, and the satisfaction as far as reasonably possible of all remaining liabilities of the Liquidating Trust, in accordance with the Plan, the Liquidating Trustee shall (i) terminate the Liquidating Trust, by giving written notice of termination to the Bankruptcy Court and the United States Trustee, which notice shall include a final report; and (ii) thereupon be forever discharged of and released from all power, duties and responsibilities under the Liquidating Trust. If the Liquidating Trustee determines, in its sole discretion, that the costs of making a further distribution of any remaining funds in the Liquidating Trust would make it impractical or not feasible to make such a distribution, the Liquidating Trustee shall contribute such funds to a charitable organization.

**E.**     **Distributions from the Liquidating Trust under the Plan.**

Subject to the costs of administering the Liquidating Trust, the Liquidating Trustee shall hold the Liquidating Trust Assets in trust for the benefit of holders of Allowed Claims and Allowed Administrative Expense Claims entitled to receive Distributions therefrom. All Distributions of Cash under the Plan shall be made by the Liquidating Trustee from the Liquidating Trust Assets or as otherwise agreed with the holder of an Allowed Claim or Allowed Administrative Expense Claim.

1.     *Payments to Holders of Allowed Administrative Expense Claims, Allowed Professional Fees and Expenses and Allowed Priority Claims.*

    **a.**     **Generally.** **Unless otherwise paid by the Debtors, the Liquidating Trustee shall make payments to the holders of Allowed Administrative Expense Claims, Allowed Professional Fees and Expenses and Allowed Priority Claims.**

    **b.**     **Timing of Distributions.** **On the later of (i) ten Business Days following the receipt of sufficient cash into the Liquidating Trust to pay**

5732594v1

Allowed Administrative Expense Claims, Allowed Professional Fees and Expenses, and Allowed Priority Claims and (ii) ten Business Days following the date after any Disputed Administrative Expense Claim or Disputed Priority Claim becomes an Allowed Administrative Expense Claim or an Allowed Priority Claim, the Liquidating Trustee shall cause such holder of an Allowed Administrative Expense Claim or Allowed Priority Claim, to be paid in Cash in amounts and on such terms as may be determined by the Bankruptcy Court. Notwithstanding anything in the Plan to the contrary, nothing shall prevent the Liquidating Trustee from making a distribution on account of an Allowed Administrative Expense Claim or Allowed Claim prior to the deadline for making such distribution.

2. *Payments to Holders of Allowed General Unsecured Claims*

a. <u>Generally</u>. After the Liquidating Trustee has made all Distributions of Cash to holders of Allowed Administrative Expense Claims, Allowed Priority Claims, and established the Post-Confirmation Reserve, all remaining Liquidating Trust Assets shall be reserved to first satisfy Allowed Class 1 Claims and Disputed Claims, after which payments will be made to satisfy Class 2 Claims. Except as otherwise specifically provided in the Plan, no interest arising after either the Petition Date or the Effective Date shall accrue or be payable to holders of Allowed Claims under the Plan.

b. <u>Timing of Distributions</u>. On the later of (i) the Initial Distribution Date and (ii) the next Subsequent Distribution Date after a Disputed Class 1 Claim becomes an Allowed Claim, the Liquidating Trustee shall cause each holder of an Allowed Class 1 Claim to receive in Cash, an amount equal to the then available Class 1 Distribution Amount, which in no events shall include any amounts in or on account of the Distribution Reserve. Notwithstanding anything in the Plan to the contrary, nothing shall prevent the Liquidating Trustee from making a distribution on account of an Allowed Administrative Expense Claim or Allowed Claim prior to the deadline for making such distribution. The Liquidating Trustee shall be entitled, in the exercise of his or her reasonable business judgment, to make a partial distribution of the Class 1 Distribution Amount to holders of Allowed Class 1 Claims on the Initial Distribution Date or on any Subsequent Distribution Date, so long as sufficient assets are retained in the Liquidating Trust to pay any then Disputed Administrative Expense Claim claims or Disputed Claims as if such claims were Allowed in full. Any rights of any Party to a Distribution is subject in all events to any rights of setoff or recoupment that may be asserted by or on behalf of the Liquidating Trust, including on account of any Cause of Action or on account of sections 502(d), 510 or 549 of the Bankruptcy Code. Class 2 Claims shall be treated the same as provided above after satisfaction of all Allowed Class 1 Claims.

3. *Delivery Of Distributions.*

a. **Generally**. Distributions and deliveries to holders of Allowed Claims will be made at (i) the addresses set forth in the Schedules if the Claim is an Allowed Scheduled Claim, (ii) at the addresses reflected in the Filed Claims if the Claims is an Allowed Claim, or (iii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of claim. If any related Distribution is returned as undeliverable, no further Distributions to the holder will be made unless and until the Liquidating Trustee is notified of the holder's then current address, at which time all missed Distributions will be made to the holder without interest. All Claims for undeliverable Distributions and any change of address notification must be made to the Liquidating Trustee on or before the one-year anniversary of the Effective Date. After that date, all unclaimed property will be distributed pursuant to the terms of the Plan, the holder of such Claim will not be entitled to any Distribution under the Plan and the Claim of any holder with respect to such property will be discharged and forever barred.

b. **Means of Cash Payment**. Cash payments made pursuant to the Plan will be in United States funds by check, or by such other means agreed to by the Liquidating Trustee and the respective holders of Allowed Claims, or, in the absence of an agreement, such commercially reasonable manner as the Liquidating Trustee shall determine in his sole discretion.

c. **Time Bar to Cash Payments**. Checks issued by the Liquidating Trustee in respect of Allowed Claims will be null and void if not cashed within 120 days of the date of their issuance. Requests for reissuance of any check shall be made in writing to the Liquidating Trustee by the holder of the Allowed Claim with respect to which the check originally was issued. Any Claim in respect of such a voided check must be made on or before the earlier of (a) six months after the date of issuance of the check and (b) the one-year anniversary of the Effective Date. After that date, all Claims in respect of void checks will be discharged and forever barred and the cash, including interest earned thereon, if any, shall be distributed in accordance with the terms of the Plan. Nothing contained in the Plan shall require the Liquidating Trustee to attempt to locate any holder of an Allowed Claim or Allowed Administrative Expense Claim.

4. *Ownership of Unclaimed Property.*

Any unclaimed property and all funds the subject of uncashed and voided checks shall revert to the ownership of the Liquidating Trust for distribution to the Liquidating Trust Beneficiaries (except as to the purported recipients of such unclaimed property and uncashed and voided checks). Notwithstanding the foregoing, nothing shall bar the Liquidating Trustee, in his or her sole discretion, from making a Distribution to a holder of an Allowed Claim after the deadlines set forth in Article III.J of the Plan.

5. *De Minimis Distributions.*

26

No Cash payment of less than five dollars ($5) shall be made by the Liquidating Trustee to any holder of Claims unless a request therefor is made in writing to the Liquidating Trustee within one hundred twenty (120) Business Days after such claim becomes an Allowed Claim. Any Cash or other property that is not distributed as a consequence of Article III.L of the Plan shall, after the last Distribution on account of Allowed Claims in the applicable Class, be treated as an undeliverable Distribution under Article III.J of the Plan.

**F.    Objections to Claims and Administrative Expense Claims.**

*1.    Objections.*

Unless otherwise ordered by the Bankruptcy Court or except as otherwise provided in the Plan, following the Effective Date, only the Liquidating Trustee shall be entitled to object to, settle, compromise, withdraw or litigate objections to Claims or objections to Administrative Expense Claims or seek to subordinate any and all Claims or Administrative Expense Claims or to recharacterize any and all Claims or Administrative Expense Claims as Equity Interests. Any objections to Claims or Administrative Expense Claims shall be served and filed on or before the Claims Objection Deadline or the Administrative Expense Claim Objection Deadline, as applicable.

*2.    Right and Authority to Compromise.*

From and after the Confirmation Date, the Liquidating Trustee may settle or compromise any Disputed Claim or Disputed Administrative Expense Claim only with the approval of the Bankruptcy Court pursuant to Bankruptcy Rule 9019, provided that Bankruptcy Court approval is not required if the settled amount of the Claim or Administrative Expense Claim is less than $25,000 or if the settled amount of the Claim or Administrative Expense Claim is less than 10% of the asserted amount of such Claim or Administrative Expense Claim.

*3.    Claims Filed After Confirmation Date.*

Except as to Claims for which the Plan expressly sets a bar date after the Confirmation Date, no Claim or amendment to any Claim shall be filed after the Confirmation Date absent leave granted by the Court or with the express written assent of the Liquidating Trustee. Any such Claim or amendment to Claim filed after the Confirmation Date without such leave or assent shall be void, of no effect, and deemed disallowed. The Liquidating Trustee shall have no obligation to respond in any way to any such Claim.

**G.    Setoff, Recoupment and Subordination.**

Except as otherwise provided in the Plan, the Liquidating Trustee may, but shall not be required to, set off and/or recoup against (i) any Claim or Administrative Expense Claim and (ii) the Distributions to be made pursuant to the Plan in respect of such Claim or Administrative Expense Claim, any claims or causes of action of any nature whatsoever the Liquidating Trustee may have against the holder of such Claim or Administrative Expense Claim, but neither the failure to do so nor the allowance of any Claim or Administrative Expense Claim under the Plan

5732594v1

shall constitute a waiver or release by the Liquidating Trustee of any such claim or cause of action the Liquidating Trust may have against such holder.

Except as otherwise set forth in the Plan, the Liquidating Trustee may object to any Claim or Administrative Expense Claim on any basis including, without limitation, that such Claim or Administrative Expense Claim should be subordinated pursuant to section 510 of the Bankruptcy Code or recharacterized as an Equity Interest.

### H.    Preservation of Causes of Action, Rights and Defenses.

Except to the extent such rights, Claims, Causes of Action, defenses, and counterclaims are expressly and specifically waived, released, transferred or assigned in connection with the Plan or in any settlement agreement approved during the Chapter 11 Case, (i) any and all rights, Claims, Causes of Action, defenses, and counterclaims accruing to the Debtors or the Estate shall vest in the Liquidating Trust, whether or not litigation relating thereto is pending on the Effective Date and whether or not any such rights, Claims, Causes of Action, defenses, and counterclaims have been listed in the Schedules or otherwise listed or referred to in this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, and (ii) neither the Debtors nor the Liquidating Trust waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes property of the Estate, (a) whether or not such right, Cause of Action, defense or counterclaim has been listed or referred to in the Schedules, this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such right, Cause of Action, defense, or counterclaim is currently known to the Debtors or the Liquidating Trust, and (c) whether or not a defendant in any litigation relating to such right, Cause of Action, defense, or counterclaim filed a proof of claim in the Chapter 11 Case, filed a notice of appearance or any other pleading or notice in the Chapter 11 Case, voted for or against the Plan, or received or retained any consideration under the Plan.

Except as expressly provided in this Disclosure Statement, and unless expressly waived, relinquished, exculpated, released, compromised or settled in the Plan, the Confirmation Order, any Final Order, or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, the Liquidating Trust will exclusively retain and may enforce, as the representative of the Estate under section 1123(b)(3)(B), and the Debtors expressly reserve and preserve for these purposes, in accordance with sections 1123(a)(5)(B) and 1123(b)(3) of the Bankruptcy Code, any claims, demands, rights, defenses and Causes of Action, specifically including, without limitation, the Avoidance Actions and any Causes of Action, all of which shall vest in the Liquidating Trust. No preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), setoff, recoupment or laches shall apply to such Causes of Action or any other claims retained by the Liquidating Trust by virtue of or in connection with the confirmation, consummation of effectiveness of the Plan.

## VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

The Debtors believe that as of the date of the filing of this Disclosure Statement, one or more of the Debtors is a party to one executory contract, the LFG Contract. In the event that any

Person may assert, or the Bankruptcy Court may find, that any such executory contract or unexpired lease exists or is valid, such executory contracts and unexpired leases are to receive the treatment explained below and in Article V of the Plan. Any executory contracts and unexpired leases that are not specifically assumed or assumed and assigned shall be deemed rejected.

### A. Rejection Procedures.

Effective upon the Effective Date, the Debtors shall reject all executory contracts and unexpired leases (if any) that exist between the Debtors and any other entity that have not previously been assumed or rejected, except those (i) assumed pursuant to a previously approved motion, (ii) that are the subject of a pending motion filed by the Debtors in the Chapter 11 Case to assume, or assume and assign, such contracts or leases, or (iii) with respect to which the Bankruptcy Court has otherwise granted the Debtors additional time to assume or reject such contracts or leases after the Effective Date. To the extent that a matter that provides the Debtors with a property right does not constitute an executory contract or unexpired lease, rejection shall not constitute an abandonment by the Debtors of such property right. Entry of the Confirmation Order shall constitute approval of the rejections under the Plan pursuant to section 365(a) of the Bankruptcy Code.

### B. Damage Claims.

All Allowed General Unsecured Claims arising from the rejection of executory contracts or unexpired leases (if any), whether under the Plan or by separate proceeding, shall be treated as Claims in Class 1 under the Plan.

    *1.*   Rejection Claims: Filing Procedure. Any Claim arising from the rejection of executory contracts or unexpired leases under the Plan must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date. The Debtors' filed notice of the Effective Date shall be delivered and deemed effective notice by mail to the respective party's address on the lease or contract or to such other address delivered by such party in writing to the Liquidating Trustee. Any Claim arising from the rejection of executory contracts or unexpired leases that is not filed within such time will be forever barred from assertion against the Debtors, the Estate and the Liquidating Trust and shall not share in any Distributions under the Plan.

    *2.*   Objection Period. The Liquidating Trustee shall have sixty (60) days to object to or seek estimation of any proof of claim filed in connection with the Debtors' rejection of such contract or lease or such additional time as may be ordered by the Court and may do so on any ground, including without limitation, that the contract or lease in question is not properly regarded as executory or unexpired.

## IX. RELEASE, DISCHARGE AND LIMITATIONS OF LIABILITY.

Article VII of the Plan contains provisions that set forth the standard of liability of various person and entities in connection with the Chapter 11 Case. These provisions will affect creditors, equity security holders, and other parties. Interested parties are encouraged to read the entirety of these sections.

## A.    Discharge.

Except as otherwise expressly provided in section 1141 of the Bankruptcy Code or the Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release, and discharge as against the Debtor Releasees of any debt of the Debtors that arose before the Effective Date, any debt of the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all Claims and Administrative Expense Claims against the Debtors of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such debt, obligation, or equity interest is filed or deemed filed under section 501 of the Bankruptcy Code, (ii) a request for allowance of Administrative Expense Claim has been filed; (iii) such Claim or Administrative Expense Claim is Allowed under section 502 of the Bankruptcy Code; or (iv) the holder of such Claim or Administrative Expense Claim has accepted the Plan; provided, however, that, for the avoidance of doubt the Debtors, the Estate and the Liquidating Trustee shall not be deemed to have waived any Claim against any Person, except as otherwise set forth in the Plan.

## B.    Injunction Relating to the Plan.

As of the Effective Date, all Persons shall be permanently enjoined from commencing or continuing, in any manner or in any place, any action or other proceeding, whether directly, indirectly, derivatively, or otherwise against the Debtor Releasees, on account of, or respecting any Claims, Administrative Expense Claims, debts, rights, causes of action, liabilities, or interests discharged pursuant to the Plan, except to the extent expressly permitted under the Plan.

## C.    Cancellation and Release of Existing Indebtedness and Liens.

Except as may otherwise be provided in the Plan, on the Effective Date, all credit agreements, promissory notes, mortgages, security agreements, invoices, contracts, agreements, and any other documents or instruments evidencing Claims against the Debtors, together with any and all Liens securing same, shall be cancelled, discharged, and released without further act or action by any Person under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed cancelled, discharged, and released. To the extent deemed necessary or advisable by the Debtors, any holder of a Claim shall promptly provide the Debtors with an appropriate instrument of cancellation, discharge, or release, as the case may be, in suitable form for recording wherever necessary to evidence such cancellation, discharge, or release, including the cancellation, discharge, or release of any Lien securing such Claim.

## D.    Releases.

By the holders of Allowed Class 1 Claims and Allowed Class 2 Claims. Upon receipt by the holder of an Allowed Class 1 Claim or an Allowed Class 2 Claim of payment of its Allowed

Claim pursuant to the Plan, such holder shall be deemed to have irrevocably and unconditionally waived, released, acquitted and forever discharged the Debtor Releasees from any and all actions, causes of action, Claims, suits, accounts, covenants, contracts, debts, demands, agreements, damages, liabilities, or obligations whatsoever of every name and nature, or on any other basis, known or unknown, suspected or unsuspected, that such holder now has or may have from the beginning of time until the Effective Date arising out of, relating to or concerning the Debtors, the Estate, the Chapter 11 Case or the Plan.

### E.     Limitation of Liability.

Neither the Liquidating Trust, the Liquidating Trustee, the Debtors, nor any of their respective employees, officers, or directors employed as of the Confirmation Date, agents, representatives, affiliates, shareholders and members, in their capacity as such, nor any attorneys, advisors or other professional persons employed by any of the foregoing during the pendency of the Chapter 11 Case, shall have or incur any liability to any person or entity for any act taken or omission made in good faith in connection with, or relating to, the Chapter 11 Case, or to negotiating, formulating, implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract instrument, security, release, or other agreement, instrument, or document created in connection with the foregoing, except for willful misconduct or gross negligence.

## X.     EFFECTIVENESS OF THE PLAN AND IMPLICATIONS THEREOF.

### A.     Definition of Effective Date.

The Effective Date shall be the first Business Day upon which all of the conditions specified below have been satisfied or waived:

      (1)    the Confirmation Order shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case;

      (2)    the Court shall have waived the fourteen-day stay provided in Bankruptcy Rule 3020(e);

      (3)    no stay of the Confirmation Order shall be in effect;

      (4)    the Bankruptcy Court shall have entered a Final Order on all Professional Fees and Expenses; and

      (5)    the Liquidating Trust shall have been created and funded as set forth in the Plan.

Notwithstanding the foregoing and any other provision of the Plan to the contrary, (i) the Debtors may defer the occurrence of the Effective Date for a period of no more than thirty (30) days beyond the date specified in the preceding sentence in their joint discretion, and (ii) any distribution of Cash or other consideration required to be made on the Effective Date shall be made on such date, or on such later date as soon as practicable thereafter that is no more than ten (10) Business Days after the Effective Date.

**B. Bar Dates Triggered Upon Occurrence of Effective Date.**

*1. Administrative Expense Claim Bar Date.*

The Administrative Expense Claims Bar Date for the filing of all Administrative Expense Claims, but for claims related to Professional Fees and Expenses, shall be thirty (30) days after the Effective Date, unless the Court establishes a different bar date for some or all Administrative Expense Claims. Holders of asserted Administrative Expense Claims, other than Professional Fees and Expenses and United States Trustee fees not paid prior to the Confirmation Date, must file its respective application for the payment of an Administrative Expense Claim on or before such Administrative Expense Claims Bar Date or forever be barred from doing so. The Liquidating Trustee shall pay any such Allowed Administrative Expense Claim as set forth in the Plan.

*2. Rejection Claims Bar Date.*

Any Claim arising from the rejection of executory contracts or unexpired leases under the Plan must be filed with the Bankruptcy Court within thirty (30) days after the Effective Date. Each holder of such a Claim (if any) must file its respective application for the payment of such Claim on or before such date or forever be barred from doing so. The Liquidating Trustee shall pay any such Claim, if and to the extent that it may become an Allowed Claim, as a Class 1 Claim as set forth in the Plan.

**C. Bankruptcy Court's Retention of Jurisdiction.**

Notwithstanding the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, section 105(a) and 1142 of the Bankruptcy Code and for, among other things, the matters identified in Article VIII of the Plan.

## XI. CERTAIN FACTORS TO BE CONSIDERED.

The holder of a Claim against the Debtors should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein) before deciding whether to vote to accept or to reject the Plan.

**A. General Considerations.**

The formulation of a plan is the principal purpose of a Chapter 11 Case. The Plan sets forth the means for satisfying the holders of Claims against, or Equity Interests in, the Debtors. The Debtors believe that reorganization of the Debtors under Chapter 11 preserves and maximizes the value of the Debtors' Estates and provides the most meaningful distribution to all holders of Claims.

**B. Federal Income Tax Consequences.**

5732594v1

All but one of the Debtors are limited liability companies treated as passthrough entities for tax purposes and thus the Debtors do not believe that implementation of the Plan will trigger any adverse tax consequences with respect to the Debtors.

With respect to holders of Allowed Claims, the federal income tax consequences of the Plan are complex and are subject to certain uncertainties. In general, and subject in all respects to numerous factors which may be unique to each holder of an Allowed Claim and about which the Debtors have no knowledge or information, each holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the Distribution and (ii) the holder's adjusted tax basis in its Allowed Claim. Where gain or loss is recognized by a holder, the character of such gain or loss as long term or short term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the holder had previously claimed a bad debt deduction. A holder who purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Internal Revenue Code ("IRC") and related regulations. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on the claim as of the date of the exchange. THE DEBTORS URGE YOU TO CONSULT WITH YOUR TAX ADVISOR AND TO RELY SOLELY ON THE ADVICE OF YOUR TAX ADVISOR IF YOU HAVE ANY TAX CONCERNS.

**The potential material federal tax consequence of the Plan on any Class of creditors as well as on any particular creditor within a Class is dependent upon numerous circumstances known only to the holders of such Claims and Equity Interests and not to the Debtors.** Some of the circumstances which make it impossible to determine the material federal tax consequences to a Class of creditors or a particular creditor include, but are not limited to: (i) the creditor entity type (individual, corporation, s-corporation, partnership, limited liability company, limited liability partnership, limited partnership, trust or any other entity allowed by various federal and state laws); (ii) the creditor may be a parent or a subsidiary of another entity, which may or may not have filed for bankruptcy protection; (iii) the creditor may be for profit or not-for-profit; (iv) the creditor may have unused and unexpired net operating losses, alternative minimum tax net operating losses, contributions carryovers, alternative minimum contribution carryovers, short or long-term capital loss carryovers or general business credits as defined in the IRC; (v) the method of accounting used by a creditor may be cash or accrual and whether the claim is a capital or ordinary asset of the creditor; (vi) a creditor's basis in its Claim against the Debtors, if any, is not known; (vii) whether the creditor is deemed to have participated in an exchange for federal income tax purposes, and, if so, whether such exchange transaction constitutes a tax-free recapitalization or a taxable transaction; (viii) whether the creditor's present debt Claim constitutes a "security" for federal income tax purposes; and, (ix) the relative size of creditor's Claim to the size of the creditor's entity.

BECAUSE THE TAX CONSEQUENCES OF THE PLAN VARY BASED UPON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH ITS OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN

TO IT UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND FOREIGN TAX LAWS.

## XII. FEASIBILITY OF THE PLAN, THE BEST INTERESTS OF CREDITORS AND "CRAMDOWN."

### A. Feasibility of the Plan.

In connection with confirmation of the Plan, the Court will determine whether the Plan is feasible pursuant to § 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization.

### B. Acceptance of the Plan.

As a condition to Confirmation of the Plan, § 1129(a) of the Bankruptcy Code, with certain exceptions, requires that each impaired Class accept the Plan. In general, a Class is "impaired" if the legal, equitable, or contractual rights attaching to the Claims or Equity Interests of that Class are modified, other than by curing defaults and reinstating maturities or by payment in full in cash.

The Bankruptcy Code defines acceptance of a plan (a) by a Class of creditors entitled to vote thereon as acceptance by holders of two-thirds in dollar amount and a majority in number of Allowed Claims in that Class and (b) by a Class of equity holders entitled to vote thereon by acceptance two-thirds in amount of such interests. Each calculation, however, includes only those holders of Allowed Claims and Equity Interests who actually vote to accept or reject the Plan.

Under § 1126(f) of the Bankruptcy Code, Classes of Allowed Claims and Equity Interests that are not "impaired" under the Plan are conclusively deemed to have accepted the Plan. Under § 1126(g) of the Bankruptcy Code, Classes that receive no distributions under the Plan are conclusively deemed to have rejected the Plan. For these reasons, acceptances of the Plan are being solicited from all Classes impaired pursuant to the Plan.

### C. Best Interests of Creditors Test.

Even if a plan is accepted by each Class, the Bankruptcy Code requires that a bankruptcy court determine that the plan is in the best interest of all holders of claims that are impaired by such plan. The so-called "best interests" test, as articulated in § 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired Class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan complies with this "best interests" test.

The Debtors believe that the Plan, and the Sale of the Property proposed therein, maximizes the payout that will be distributed to general unsecured creditors.

The principal alternative to the Plan is conversion or dismissal of these Chapter 11 Case. The Debtors believe that holders of Allowed Class 1 Claims would achieve a lower payment absent the Plan. Conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code would likely result in additional costs and delays in introducing a Chapter 7 trustee to the Debtors' business affairs that would achieve a lower payout for holders of Claims than such holders may expect to receive under the Plan.

For the foregoing reasons, the Debtors believe that the Plan represents the highest available recovery for the Debtors' creditors, and a far better result than a Chapter 7 liquidation, and otherwise is in the best interests of the Debtors, their creditors and their Estates.

### D. Confirmation with Acceptance of an Impaired Class: the "Cramdown" Alternative.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed as long as at least one impaired Class of Claims has accepted it. If a Class rejects the Plan, the Court may nevertheless confirm the Plan at the request of the Debtors upon finding that the Plan "does not discriminate unfairly" and is "fair and equitable" as to each dissenting impaired Class. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting Class is treated equally with respect to other Classes of equal rank.

A plan is fair and equitable as to a Class of secured claims that rejects such plan if the plan provides (a)(i) that the holders of claims included in the rejecting Class retain the liens securing those claims whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such Class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the Estate' interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting Class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (b) of this subparagraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a Class of unsecured claims which rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting Class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) that the holder of any claim that is junior to the claims of such Class will not receive or retain on account of such junior claim or interest any property at all.

In this Chapter 11 Case, the Debtors expect Class 1 (which is impaired) to accept the Plan because, among other things, the holders of Allowed Class 1 Claims are unlikely to forego the only meaningful prospect of receiving a dividend in the Chapter 11 Case. Creditors are likely to receive less, distribution if the Plan is not confirmed, and thus the Debtors believe common sense suggests creditors in Class 1 will overwhelmingly vote to accept the Plan. If they do not, the Debtors believe that the Plan is nevertheless confirmable because the Plan provides that Equity

Interests are cancelled under the Plan and holders of such interests receive only residual distributions remaining after payment of all Allowed Claims in Class 1 on account of them.

## XIII. ALTERNATIVES TO THE PLAN.

The Debtors believe that the Plan affords holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the alternatives include: (a) continuation of the pending Chapter 11 Case; (b) an alternative plan or plans of liquidation; or (c) dismissal of the Chapter 11 Case or liquidation of the Debtors under Chapter 7 of the Bankruptcy Code.

### A. Continuation of the Chapter 11 Case.

If the Chapter 11 Case remains in Chapter 11, the Debtors will continue to accrue administrative liabilities that could impair their ability to formulate a plan of reorganization.

### B. Alternative Plans of Reorganization.

If the Plan is not confirmed, the Debtors, or with relief from the Bankruptcy Court, any other party-in-interest in the Chapter 11 Case could propose a different plan or plans.

Indeed, the Debtors believe that, if the Plan is not promptly confirmed, the Bankruptcy Court will convert the Chapter 11 Case to a Case under Chapter 7 of the Bankruptcy Code.

### C. Liquidation of the Debtors under Chapter 7 or Dismissal of the Chapter 11 Case.

If no plan is confirmed, the Debtors' Chapter 11 Case will be converted to a case under Chapter 7 of the Bankruptcy Code or dismissed. Were the Chapter 11 Case to be converted to a case under Chapter 7, the cost of such conversion is likely to result in additional costs and delays. Attached hereto as <u>Exhibit A</u> is a Liquidation Analysis prepared by the Debtors which details the additional costs which would be incurred if the Chapter 11 Case were converted to Chapter 7. In the event of a dismissal, the Debtors lack the wherewithal to continue operations and accordingly expect that holders of General Unsecured Claims would receive a considerably reduced payment.

## XIV. CONCLUSION

This Disclosure Statement has been approved by the Court after notice and a hearing after a determination that this Disclosure Statement contains information adequate to permit holders of Claims to make an informed judgment about the Plan. Such approval, however, does not mean that the Court recommends either acceptance or rejection of the Plan.

### A. Voting Requirements.

On _____, the Court entered an order approving this Disclosure Statement, setting voting procedures and scheduling the hearing on the confirmation of the Plan (Docket No. ___). A copy of the notice of the Confirmation Hearing is enclosed with this Disclosure Statement.

5732594v1

The Notice of the Confirmation Hearing sets forth in detail, among other things, the voting deadline and objection deadline. The Notice of Hearing and the instructions attached to the Ballot should be read in connection with this section of this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received or about the amount of your Claim, please contact:

> Gayle P. Ehrlich
> Christopher Gosselin
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA 02109
> Tel: 617-338-2800
> Facsimile: 617-338-2880
> E-Mail: gehrlich@sandw.com
> E-Mail: cgosselin@sandw.com
>
> Counsel *for Debtors Global Energy Holdings Group, Inc., Augusta Biofuels, LLC, Spring Hope Biofuels, LLC, Xethanol Biofuels, LLC, and GES-Live Oak Hickory Ride, LLC*

You may use the above contact information if you wish to obtain, at your own expense, unless otherwise specifically required by Rule 3017(d) of the Federal Rule of Bankruptcy Procedure, an additional copy of the Plan, this Disclosure Statement or any appendices or exhibits to such documents.

The Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code and that the disclosures by the Debtors concerning the Plan have been adequate and have included information concerning all payments made or promised by the Debtors in connection with the Plan and the Chapter 11 Case. In addition, the Court must determine that the Plan has been proposed in good faith and not by any means forbidden by law, and under Bankruptcy Rule 3020(b)(2), it may do so without receiving evidence if no objection is timely filed.

In particular, the Bankruptcy Code requires the Court to find, among other things, that (a) the Plan has been accepted by the requisite votes of all Classes of impaired Claims and Equity Interests unless approval will be sought under section 1129(b) of the Bankruptcy Code in spite of the dissent of one or more such Classes, (b) the Plan is "feasible", which means that there is a reasonable probability that the Plan proponent will be able to perform its or their obligations under the Plan and continue to operate the Debtors' businesses without further financial reorganization or liquidation (unless the plan is a liquidating plan, in which case this element would not apply), and (c) the Plan is in the "best interests" of all holders of Claims or Equity Interests. The Court must find that all conditions mentioned above are met before it can confirm the Plan. Thus, even if all the Classes of impaired Claims accept the Plan by the requisite votes, the Court must make an independent finding that the Plan conforms to the requirements of the Bankruptcy Code, that the Plan is feasible, and that the Plan is in the best interests of the holders of Claims. These statutory conditions to confirmation are discussed above.

5732594v1

*1. Parties-In-Interest Entitled to Vote.*

Under section 1124 of the Bankruptcy Code, a Class of claims or interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

In general, a holder of a claim or interest may vote to accept or to reject a plan if (a) the claim or interest is "allowed," which means generally that the Debtors have not objected to such claim or interest, and (b) the claim or interest is impaired by the Plan. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan. If the claim or interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent and, therefore, such holder's vote need not be solicited.

The holder of a Claim against the Debtors that is impaired under the Plan is entitled to vote to accept or reject the Plan if: (a) the Plan provides a distribution in respect of such Claim that has not already been paid; and (b) (i) the Claim has been scheduled by the Debtors (and such Claim is not scheduled as disputed, contingent or unliquidated), or (ii) it has filed a proof of claim on or before the Bar Date and such Claim is not the subject of an objection filed with the Court, or (iii) the Court, pursuant to §§ 502(a) and 1126(a) of the Bankruptcy Code and Bankruptcy Rule 3018(a), and upon application of the holder of the Claim with respect to which there has been objection, temporarily allows the Claim in an amount that the Court deems proper for the purpose of accepting or rejecting the Plan.

A Ballot cast with respect to the Plan does not result in the filing or allowance of a Claim, nor does the casting of a Ballot relieve a creditor of the obligation to timely file a proof of claim.

A vote may be disregarded if (i) the Claim on which the Ballot is based is not an Allowed Claim at the time the vote is received by the Balloting Agent, or (ii) the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that the vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

*2. Classes Impaired Under the Plan.*

Classes 1 is impaired under, and are entitled to vote on, the Plan. Class 2 will receive only a residual distribution, if any, after payment in full of Class 1 Allowed Claims, on account of the Equity Interests under the Plan. Class 2 is unimpaired under, and deemed to accept, the Plan, and therefore is not entitled to vote on the Plan. Accordingly, the Debtors will solicit votes only from the holders of Claims in Class 1.

**B.      Hearing on and Objections to Confirmation of the Plan.**

*1. Confirmation Hearing.*

38

The hearing on confirmation of the Plan has been scheduled for _____, 2010 at ___ _.m. (Prevailing Eastern Time), before the Honorable Peter J. Walsh, United States Bankruptcy Judge, at the United States Bankruptcy Court, District of Delaware, 824 North Market Street, 6th Floor, Courtroom #2 Wilmington, Delaware 19801. Such hearing may be adjourned from time to time by announcing such adjournment in open court, all without further notice to parties-in-interest, and the Plan may be modified by the Debtors pursuant to section 1127 of the Bankruptcy Code prior to, during, or as a result of that hearing, without further notice to parties in interest, so long as any such modifications comply with section 1127(b) of the Bankruptcy Code.

2.      *Date Set for Filing Objections to Confirmation of the Plan.*

Objections to confirmation of the Plan must be filed with the Court by _____ _.m., Prevailing Eastern Time, on _____, 2010 and served so as to be received on that date on each of the Notice Parties.

3.      *Date Set for Filing Objections to Classification under the Plan.*

Objections to the classification of any Claim under the Plan must be filed with the Court by ___ _.m., Prevailing Eastern Time, on _____, 2010 and served so as to be received on that date on each of the Notice Parties.

4.      *Date Set for Rule 3018(a) Motion and Section 502(c) Motion Deadline.*

The deadline for filing motions pursuant to Bankruptcy Rule 3018(a) ("Rule 3018(a) Motions") and serving such motions in the manner set forth herein shall be _____, 2010 (the "Rule 3018(a) Motion Deadline"), and served so as to be received on that date on each of the Notice Parties, provided, however, that if the Debtors or any other party objects to a Claim on or after ten (10) days prior to the Rule 3018(a) Motion Deadline, the Rule 3018(a) Motion Deadline shall be extended as to such claim such that the holder thereof shall have at least seven (7) days from the date of filing of such objection to file and serve a Rule 3018(a) Motion.

The deadline for filing any motions pursuant to section 502(c) of the Bankruptcy Code shall be the same date as the Rule 3018(a) Motion Deadline.

Pursuant to sections 105(a), 1126(a) and 1129 of the Bankruptcy Code, any claim as to which an objection has been filed, whether to the entire claim or a portion thereof, shall not be entitled to vote on the Plan and shall not be counted in determining whether the requirements of section 1126(c) of the Bankruptcy Code have been met with respect to the Plan (a) unless and only to the extent that the claim has been temporarily allowed for voting purposes by a final order not subject to appeal, or as to which the time for taking such appeal has expired, pursuant to § 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018(a) or (b) except to the extent that, on or before the Voting Deadline (as set forth in section III.C herein), the objection to such claim has been resolved in favor of the asserting creditor.

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE DEBTORS THUS URGE

5732594v1

ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY THE VOTING DEADLINE.

Dated: _____, 2010

**GLOBAL ENERGY HOLDINGS GROUP, INC.**

By: _____
     Authorized Individual

_____
Title of Authorized Individual


**AUGUSTA BIOFUELS, LLC**

By: _____
     Authorized Individual

_____
Title of Authorized Individual


**SPRING HOPE BIOFUELS, LLC**

By: _____
     Authorized Individual

_____
Title of Authorized Individual


**XETHANOL BIOFUELS, LLC**

By: _____
     Authorized Individual

_____
Title of Authorized Individual


**GES-LIVE OAK HICKORY RIDGE, LLC**

By: _____
     Authorized Individual

_____
Title of Authorized Individual

5732594v1

# EXHIBIT 'A'

Liquidation analysis 1st iterat

| Global Energy Holdings | Date: | 06/28/10 | | |
|---|---|---|---|---|
| | by: Allomet Partners LLC | | | |
| | | | | |
| **Liquidaton Analysis–Estimated** | | | | |
| | | | | |
| A) Estimated Value of GNH @ 30June | Subject to recalculation & confirmation | | | |
| | | | | |
| | | Range of value (if applicable) | | |
| | | | | |
| Cash | | $178,250.00 | | |
| | | $1,900,000.00 | $2,000,000.00 | net expected from Hickory Ridge transaction |
| Investments | | $80,500.00 | | 70,000 share Carbon Motors @1.15** |
| | | $52,500.00 | | 50,000 warrants Carbon Motors @1.05** |
| | | | | ** Estimated current value. Monetize or |
| | | | | hold for appreciation. |
| | | | | |
| CONTINGENT ASSETS: Unsold Real Estate | | | | |
| Augusta | | $2,670,000.00 | $2,848,000.00 | Sales of Augusta property-net of commissions & fees. |
| | | | | Assumes $3-3.2 MM gross sales price. |
| Springhope | | $315,000.00 | $360,000.00 | Sale of Springhope property-net of commissions & fees |
| | | | | Assume $300-400M sales price |
| | | | | |
| POTENTIAL ASSET VALUE | | $5,196,250.00 | $5,519,250.00 | |
| B) Less Administrative Claims | | $775,000.00 | $900,000.00 | Estimated professional fees/fee applications |
| Less retainers outstanding | | -$302,000.00 | -$302,000.00 | |
| | | | | |
| C) Less priority payroll claims | | $149,600.00 | | |
| | | | | |
| D) Liquidation–Estimated Costs | | | | |
| Added legal and other professional fees | | $50,000.00 | $75,000.00 | |
| Liquidating Trustee Costs | Est. 6 months: 120-180 hours | $24,000.00 | $36,000.00 | |
| Administrative support | 12 hrs/wk: 16-24 wks. | $2,880.00 | $4,320.00 | |
| Other expenses of the trust | | $1,500.00 | $1,500.00 | |

Liquidation analysis 1st iterat

| D) Unsecured claims | | | | | |
|---|---|---|---|---|---|
| | Claims filed | | $3,299,265.00 | | No adjustment for contested/negotiated claims. |
| | | Add residual payroll claims | $603,860.00 | | |
| | | | | | |
| | Accts payable-corp. records w/o claims | | $519,600.00 | | |
| | | | | | |
| | | Subtotal: lines 28 through 47 | $5,123,705.00 | $5,287,145.00 | |
| | | | | | |
| | Net available prior to Jacoby claim: | | $72,545.00 | $232,105.00 | Available for Class 2 claims prior to Jacoby claim. |
| | | | | | |
| | | Jacoby Claim | $10,000,000.00 | | To be adjudicated or negotiated |
| | | | | | |
| | Estimated claims payment excl. Jacoby | | 100.00% | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| E) Chapter 7 liquidation alternative | | | | | |
| | | | | | |
| | Chapter 7 Trustee Fee calculated per statute | | $175,000.00 | $190,000.00 | |
| | Added legal and other professional fees | | $75,000.00 | $125,000.00 | |
| | Administrative support    12 hrs/wk: 16-24 wks. | | $2,880.00 | $4,320.00 | |
| | Other expenses of the trust | | $1,500.00 | $1,500.00 | |
| | | | $254,380.00 | $320,820.00 | |
| | | | | | |
| | | | | | |
| | NOTE: THE DIFFERENCE BETWEEN THE PLAN CALLING FOR A LIQUIDATING TRUST (ITEM D) | | | | |
| | AND LIQUIDATION UNDER CHAPTER 7 IS: | | $176,000.00 | $204,000.00 | |
| | | | | | |
| | Net available prior to Jacoby claim: | | 97% | 100% | |
| | | | | | |
| | Net available for class 2 claims prior to | | 2.50% | 0%. | |
| | Jacoby claim: | | | | |

Page 2