# EXHIBIT A

Execution Version

CONTRACT FOR THE PURCHASE AND
SALE OF REAL AND PERSONAL PROPERTY

THIS CONTRACT FOR THE PURCHASE AND SALE OF REAL AND PERSONAL PROPERTY (this "Contract") is made as the Effective Date, by and between **ROBERT L. FRANKLIN**, in his capacity as Liquidating Trustee of the substantively consolidated post-effective estates of Global Energy Holdings Group, Inc., et al. ("Seller") and **DSM CHEMICALS NORTH AMERICA, INC.**, a Delaware corporation ("Purchaser").

WITNESSETH:

**WHEREAS**, Seller owns certain real and personal property located at 1736 Lovers Lane in Augusta-Richmond County, Georgia; and

**WHEREAS**, Purchaser desires to buy, and Seller to sell, the above-referenced real and personal property.

**WHEREAS**, Seller and Purchaser stipulate and agree that the Breakage Fee acted as a necessary inducement to Purchaser to enter into this Contract and thereby submit a bid to purchase the Property, and the Breakage Fee is necessary to induce Purchaser to continue to bid for the Property and to preserve Purchaser's bid for the Property in the event an auction for the Property is conducted.

**NOW THEREFORE**, in consideration of the mutual benefits and covenants herein contained and $10.00 and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the parties agree as follows:

1.  Definitions. Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed in Section 36.

2.  Property. At the Closing, Purchaser shall buy and Seller shall sell, the following property (hereinafter collectively referred to as the "Property"), subject to the terms and conditions of this Contract:

    A.    Those certain two tracts of real property situated in Augusta-Richmond County, Georgia, consisting of approximately 40.29 acres, more or less, as described on Exhibit "A" attached hereto, together with all rights and appurtenances pertaining to such real property, including, without limitation, any right, title and interest of Seller in and to adjacent streets, alleys, and rights-of-way (hereinafter collectively referred to as the "Real Property");

    B.    The Personal Property;

US2000 12006236.11

C.    All improvements, structures and fixtures located upon the Real Property (hereinafter collectively referred to as the "Improvements"); and

D.    All of Seller's contract rights and all other intangible rights or privileges that are appurtenant to or relate to the Real Property or the Improvements, including without limitation, all permits, certificates, licenses and approvals issued or required by any Governmental Authority for the ownership of the Property as and to the extent assignable (hereinafter collectively referred to as the "Intangible Property") as listed in Exhibit "C".

3.    Purchase Price.  At the Closing, the Purchase Price, after crediting the Earnest Money and subject to the prorations and expenses of sale identified herein, shall be paid by wire transfer of funds immediately available to Seller, pursuant to instructions to be provided by Seller.

4.    Earnest Money.  On or before the date three (3) business days after the Effective Date, Purchaser shall deposit with Escrow Agent the Earnest Money.  Escrow Agent shall promptly notify Seller upon receipt of the Earnest Money.  Escrow Agent shall hold and disburse the Earnest Money in accordance with the terms and conditions of this Contract and the terms and conditions set forth on Exhibit "D" attached hereto.  Escrow Agent shall invest the Earnest Money and any other funds of Purchaser held under the control of Escrow Agent in accordance with the Investment Instructions.  Additionally, notwithstanding any provision of this Contract to the contrary, Escrow Agent agrees to deposit and maintain the Earnest Money and any other funds of Purchaser held under the control of Escrow Agent in one or more segregated accounts that are (x) not commingled with any other funds, and (y) necessary to avoid exceeding federal deposit insurance limits on any single escrow deposit account.

5.    Sale Motion, Order and Conveyance.  Seller and Purchaser acknowledge that Seller proceeding with the transactions proposed by the terms of this Contract is subject to receipt of authorization from the Bankruptcy Court.  Promptly following receipt of notification of Escrow Agent's receipt of the Earnest Money, Seller shall file the Sale Motion seeking issuance of the Sale Order.  Each party's obligations under this Contract to consummate the purchase and sale of the Property shall be conditioned upon the Bankruptcy Court entering the Sale Order, and the Sale Order not having been reversed, stayed, set aside, or annulled prior to the Closing.  From and after the Effective Date, Seller shall use its reasonable best efforts to cause the issuance of the Sale Order, including the preparation and filing, of all required motions relative thereto.  If the Sale Order has been reversed, stayed, set aside or annulled before the Closing, then the Purchaser may (a) terminate this Contract, in which event the Earnest Money shall be refunded to Purchaser immediately upon request, all rights and obligations of Seller and Purchaser under this Contract shall expire, and this Contract shall become null and void, or (b) extend the Closing Date for a period of up to sixty (60) days or longer (provided the Trustee agrees to such longer period), during which time Seller shall continue to seek the issuance of a Final Order.  In the event of an extension of the Closing Date by Purchaser under clause (b) above, and a subsequent failure of Seller to seek, as determined in Purchaser's reasonable discretion, and obtain the issuance of the Final

2

Order, Purchaser may then, to the extent applicable, elect to exercise its right to terminate this Contract pursuant to clause (a). Purchaser acknowledges that Seller may conduct an auction for the Property. If Seller consummates an Alternate Sale, Purchaser shall be paid the Breakage Fee on the date the Alternate Sale is consummated from the proceeds of the Alternate Sale. Seller covenants and agrees that Seller shall not sell the Property pursuant to an Alternate Sale for a price less than an amount equal to one hundred five percent (105%) of the Purchase Price (the "Overbid Amount"). Simultaneously with filing of the Sale Motion, Seller shall file a motion seeking Bankruptcy Court approval of the Breakage Fee and the Overbid Amount. Purchaser acknowledges that Seller's agreement above with regard to the Breakage Fee and the Overbid Amount is subject to receipt of authorization of and approval by the Bankruptcy Court pursuant to a Final Order; provided, however, if the Bankruptcy Court does not authorize and approve the Breakage Fee and the Overbid Amount, Purchaser, at its option, shall have the right to terminate this Contract, in which event the Earnest Money shall be refunded to Purchaser immediately upon request, all rights and obligations of Seller and Purchaser under this Contract shall expire, and this Contract shall become null and void.

6. <u>Inspection</u>. Between the Effective Date and the Closing Date, Purchaser, its agents, employees, independent contractors and representatives shall have access to the Property upon reasonable notice for the purpose of conducting investigations and examinations and otherwise examining the physical, structural, mechanical, and topographical nature of the Property. All such inspections, investigations and examinations shall be undertaken at Purchaser's sole risk, cost and expense. Purchaser hereby agrees to indemnify and hold Seller harmless from any and all claims made or causes of action brought against Seller or the Property to the extent directly resulting from the activities of Purchaser or any of Purchaser's agents or servants in conducting any of the inspections. To the extent not previously provided, Seller shall provide to Purchaser all reports and other documents regarding the Property and Seller's operation of the Property. No state, condition or information of which Purchaser is aware as of the Effective Date or obtains actual knowledge of following the Effective Date shall excuse Purchaser's performance under this Contract; provided, however, in no event shall any such state, condition or information or knowledge thereof waive or excuse the satisfaction of any condition provided in Section 10.

7. <u>Title Matters</u>.

    (a) Purchaser has obtained the Title Report from the Title Company a copy of which has been provided to Seller. Seller covenants to convey to Purchaser at Closing good and marketable fee simple title in and to the Real Property. For the purposes of this Contract, "good and marketable fee simple title" shall mean fee simple ownership which is: (i) free of all defects, claims, liens and encumbrances of any kind or nature whatsoever other than the Permitted Exceptions; (ii) insurable by the Title Company, at then current standard rates under standard form of extended coverage ALTA owner's policy of title insurance (ALTA Form B-2006), with the standard or pre-printed exceptions therein deleted and without exception other than for the Permitted Exceptions (the "Title Policy"), as is consistent with the

3

practice in the region where the Real Property is located. Purchaser shall have until the Closing Date in which to reexamine title to the Property and in which to give Seller written notice of any objections disclosed following the date of the Title Report (provided, however, Purchaser shall not have the right in any such subsequent notice of additional objections to object to any Permitted Exceptions). Purchaser acknowledges and agrees that the Confirmation Order and the Sale Order, once issued, provide sufficient evidence for Seller to execute and deliver this Contract.

(b)     Seller shall have until the Closing Date in which to satisfy all objections specified in any notice of title objections given by Purchaser. If Seller fails to satisfy any such objections, then, at Purchaser's option, Purchaser may: (i) terminate this Contract, in which event the Earnest Money shall be refunded to Purchaser immediately upon request, all rights and obligations of Seller and Purchaser under this Contract shall expire, and this Contract shall become null and void; or (ii) satisfy the objections, after deducting from the Purchase Price the reasonable cost of satisfying such objections, if, but only if, any such objections are based upon a Monetary Encumbrance; or (iii) waive such satisfaction and performance and consummate the purchase and sale of the Property; or (iv) extend the Closing Date for a period of up to ninety (90) days, during which time Seller may cure such title objections that may be subject to cure; or (v) if, but only if, (A) any objection is a Monetary Encumbrance, or (B) any objection arises or first appears of record subsequent to the date of the Title Report, and arises through the act of, or with the consent of, Seller, exercise such rights and remedies as may be provided for or allowed by this Contract. In the event of an extension of the Closing Date by Purchaser under clause (iv), above, and a subsequent failure of Seller to cure any objection specified in any notice of title objection given by Purchaser, Purchaser may then, to the extent applicable, elect among the alternatives specified in clauses (i), (ii), (iii) and (v), above.

(c)     Notwithstanding any provision of this Contract to the contrary, Seller shall deliver at Closing Seller's Affidavit.

8.   <u>Closing Date</u>. The Closing shall be held at the officers of Escrow Agent on or before three (3) business days after the Sale Order is entered (the "<u>Closing Date</u>") but in any event no later than July 1, 2011, unless otherwise extended under the terms of this Contract.

9.   <u>Conditions Precedent to Seller's Obligation</u>. Seller's obligation to effect the Closing on the Closing Date is subject to the following conditions:

(a)     <u>Payments</u>. Seller shall have received the Purchase Price; and

(b)     <u>Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order, which shall be a Final Order, or which requirement as a Final Order shall have been waived by both Seller and Purchaser.

4

10.  <u>Conditions Precedent to Purchaser's Obligation</u>.  Purchaser's obligation to effect the Closing on the Closing Date is subject to the following conditions:

(a)    The Bankruptcy Court shall have entered the Sale Order.

(b)    Seller shall have materially kept, observed, performed, satisfied and complied with all material terms, covenants, conditions, agreements, requirements, restrictions and provisions required by this Contract to be kept, observed, performed, satisfied or complied with by Seller before, on or as of the Closing Date;

(c)    The representations and warranties of Seller in this Contract (and the substantive facts contained in any material representations and warranties limited to Seller's knowledge) shall be materially true and correct, and certified by Seller to Purchaser as such, on and as of the Closing Date, in the same manner and with the same effect as though such representations and warranties had been made on and as of the Closing Date;

(d)    Purchaser shall not have terminated this Contract pursuant to an express right so to terminate set forth in this Contract;

(e)    Title to the Property shall be in the condition required by Section 7 of this Contract, and no matters affecting title to the Property shall have been filed or recorded and not be satisfied, terminated or released by Seller between the effective date of Purchaser's most recent update of the Title Report and recordation of the Deed (as defined below), and the Title Company shall have irrevocably committed to issue the Title Policy, without exception other than for the Permitted Exceptions;

(f)    On the Closing Date, the Property shall be in substantially the same condition as it was on the Effective Date;

(g)    (i) Seller shall have satisfied the obligation to provide forty-five (45) days advance written notice to G.D. Searle LLC and Pfizer Inc. of the transaction contemplated pursuant to this Contract as required by Section 9 of the Access Agreement and such obligation shall be deemed satisfied if written evidence reasonable acceptable to Purchaser is provided that either (a) Pfizer Inc. shall waive such obligation in writing or (b) the Sale Order shall specifically excuse Seller's performance of such obligation and a copy of such Sale Order is provided to Pfizer Inc. and (ii) Pfizer and Purchaser shall have entered into an access agreement in a form substantially similar to the Access Agreement and otherwise reasonably acceptable to Purchaser which such agreement shall provide that it supersedes the Access Agreement;

(h)    Seller shall have satisfied the obligation to provide twenty (20) days advance written notice to the Central Savannah River Land Trust, Inc. of the transaction contemplated pursuant to this Contract as required by Article XI of the

5

Conservation Easement and such obligation shall be deemed satisfied if written evidence reasonable acceptable to Purchaser is provided that either (i) the Central Savannah River Land Trust, Inc. shall waive such obligation in writing or (ii) the Sale Order shall specifically excuse Seller's performance of such obligation and a copy of such Sale Order is provided to the Central Savannah River Land Trust, Inc.;

(i)     The Escrow Agent shall be holding in trust a limited warranty deed from General Chemical Corporation in form and substance reasonably acceptable to Purchaser which deed, when recorded, shall convey good and marketable fee simple title of that certain real property described in Exhibit "I" attached hereto and made a part hereof (the "GC Deed"), the property conveyed by the GC Deed shall be a legally subdivided parcel and shall be insurable by the Title Company in the Title Policy and no condition, except the delivery for recordation of the ABF Deed (as defined below), shall exist for the release and recordation of the GC Deed;

(j)     Seller shall have delivered to the Title Company a limited warranty deed in favor of General Chemical Corporation which deed, when recorded, shall convey good and marketable fee simple title of that certain property described in Exhibit "J" attached hereto and made a part hereof (the "ABF Deed"); and

(k)     Purchaser shall have received estoppel certificates from each of NSC Operating Company and Elanco Products Co. confirming that no defaults exist under the Easement Agreement with respect to Seller other than defaults which are monetary in nature and for which Seller's performance of its obligations in Section 12(c) will cure.

If any of the foregoing items have not been satisfied or performed or waived in writing by Purchaser on or as of the Closing Date, Purchaser shall provide Seller written notice of the existence of such condition following which the Purchaser shall have the right, at Purchaser's option, to (i) waive the satisfaction and performance of such condition and consummate the purchase and sale of the Property; or (ii) with the agreement of Seller extend the Closing Date for two consecutive periods of up to sixty (60) days each, during which time Seller shall use its reasonable best efforts to satisfy or perform such condition. Within two business days following the satisfaction of any of the above conditions, either Party shall provide the other notice of same and the Closing shall occur within five (5) business days of such notice. In the event of an extension of the Closing Date under clause (ii), above, and a subsequent failure of Seller to satisfy or perform such condition or conditions, Purchaser may then, to the extent applicable, elect among the alternative specified in clause (i) or terminate the Contract by giving written notice to Seller.

6

11.    <u>Proceedings at Closing</u>. On the Closing Date, the Closing shall take place as follows:

    (a)    Seller shall cause to be duly executed and delivered to Purchaser the following documents, all of which shall be in form and substance reasonably satisfactory to Purchaser and its counsel:

        (i)    The Deed

        (ii)    The Quitclaim Deed;

        (iii)    The ABF Deed;

        (iv)    A Georgia Transfer Tax Declaration (Form PT-61) for each of the Deed, the ABF Deed and Quitclaim Deed;

        (v)    A bill of sale, conveying title to the Personal Property in the form attached hereto as <u>Exhibit "H"</u>;

        (vi)    An assignment transferring the Intangible Property to Purchaser;

        (vii)    The Seller's Affidavit;

        (viii)    An affidavit by Seller stating Seller's United States taxpayer identification number and stating that Seller is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person" as defined in Section 1445 of the Internal Revenue Code of 1986, as amended;

        (ix)    A Certificate and Affidavit as to whether (a) Seller is a resident of the State of Georgia (as defined in O.C.G.A. § 48-7-128(a), or (b) Seller is deemed to be a resident of the State of Georgia pursuant to O.C.G.A. § 48-7-128, or (c) the sale of the Property by Seller is otherwise exempt from the withholding requirements of O.C.G.A. § 48-7-128.

        (x)    A completed 1099-S request for taxpayer identification number and certification;

        (xi)    A certificate to the effect that the representations and warranties of Seller in this Contract are true and correct on and as of the Closing Date;

        (xii)    The Sale Order; and

        (xiii)    The Closing Statement.

    (b)    Purchaser shall (i) pay the remainder of the Purchase Price, after crediting the Earnest Money and making the adjustments and prorations provided for in the Closing Statement, to Seller in accordance with the provisions of this Contract,

7

and (ii) deliver to Seller the Closing Statement, dully executed by or on behalf of Purchaser.

(c)    The Title Company shall irrevocably commit to issue the Title Policy, without exception other than for the Permitted Exceptions.

(d)    Seller shall deliver possession of the Property to Purchaser at Closing.

Notwithstanding any provision of this Contract to the contrary, Seller acknowledges and agrees that (x) Purchaser's obligation to deliver funds in connection with Closing is expressly conditioned upon the satisfaction of all other conditions required to cause Closing to be consummated, except for the delivery of such funds, and (y) the requirements of Section 9(a) shall be deemed satisfied by Purchaser, on the Closing Date, delivering the Purchase Price to Escrow Agent and authorizing Escrow Agent to disburse such funds in accordance with the Closing Statement.

12.    <u>Payments at Closing.</u>

(a)    At Closing, Seller shall pay:

(i)    The transfer tax on the Deed unless exempted pursuant to the Confirmation Order or the Sale Order;

(ii)    Seller's attorneys' fees and all other costs incurred by Seller in connection with this transaction.

(b)    At Closing, Purchaser shall pay:

(i)    The Purchase Price, less the Earnest Money and any credits, pro-rations, and adjustments provided in this Contract;

(ii)    The costs relating to the recordation of the Deed and the Quitclaim Deed;

(iii)    The premium for the Title Policy (including all charges for any endorsements); and

(iv)    Purchaser's attorneys' fees and all other costs incurred by Purchaser in connection with this transaction.

(c)    At Closing, ad valorem taxes on the Property shall be prorated as of the date of Closing. Seller covenants and agrees to pay any delinquent ad valorem taxes and any other delinquent assessments prior to or at the Closing. In the event tax bills have not been issued for the year of Closing, taxes shall be prorated based on the previous year's tax bill and shall be reprorated when the current year's tax bill is available. All income and expenses of the Property, including, without limitation, those arising in connection with the Easement Agreement, also shall be prorated as of the Closing Date and appropriate payments or credits made at Closing.

8

Seller shall cause the meters of any Utility to be read on the Closing Date; however, in the event that any supplier of any Utility is unable or unwilling to read any such meter, then the charges for such Utility shall be prorated based upon the bill for the immediately preceding billing period.

13. <u>Covenants of Seller</u>. Seller shall use best efforts to gain approval by the Bankruptcy Court of this Contract and all transactions set forth herein, and promptly following the execution and delivery of this Contract, Seller will file the Sale Motion with the Bankruptcy Court seeking entry of the Sale Order. Seller shall use its reasonable best efforts to obtain the entry of the Sale Order approving this Contract and the transactions contemplated thereby in form and substance customary for similar transactions in the Bankruptcy Court and reasonably satisfactory to Purchaser. Upon obtaining a hearing date for the Sale Motion, Seller shall give notice of the Sale Motion and the hearing thereon as and when required by applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and orders of the Bankruptcy Court, subject to the approval of the Bankruptcy Court.

14. <u>Representations and Warranties of Purchaser</u>. Purchaser represents, warrants and covenants to and with Seller, knowing that Seller is relying on each such representation, warranty and covenant, that:

   (a)    Purchaser is a corporation, duly organized, validly existing and in good standing under the laws of the State of Delaware.

   (b)    Purchaser has full corporate power and authority to enter into and perform this Contract, the documents and certificates to be executed and delivered by Purchaser pursuant hereto, and each and all of the transactions contemplated hereby and thereby in accordance with the terms hereof and thereof. Purchaser has by all necessary action, validly authorized the execution, delivery and performance of this Contract, the documents and certificates to be executed and delivered by Contract in connection herewith and the transactions contemplated hereby and thereby in accordance with the terms hereof.

15. <u>Representations and Warranties of Seller</u>. Seller represents, warrants and covenants to and with Purchaser, knowing that Purchaser is relying on each such representation, warranty and covenant, that:

   (a)    Seller was appointed pursuant to the Confirmation Order.

   (b)    Subject to compliance with the Sale Order, Seller has the lawful right, power, authority and capacity to sell the Property in accordance with the terms, provisions and conditions of this Contract.

   (c)    Except for the Bankruptcy Proceeding, there are no actions, suits or proceedings pending or threatened against, by or affecting Seller that affect title to the Property or that question the validity or enforceability of this Contract or of any

9

action taken by Seller under this Contract, in any court or before any governmental authority, domestic or foreign.

(d)    The execution of and entry into this Contract, the execution and delivery of the documents and instruments to be executed and delivered by Seller on the Closing Date, and the performance by Seller of Seller's duties and obligations under this Contract and of all other acts necessary and appropriate for the full consummation of the purchase and sale of the Property as contemplated by and provided for in this Contract, are consistent with and not in violation of, and will not create any adverse condition under, any contract, agreement or other instrument to which Seller is a party, any judicial order or judgment of any nature by which Seller is bound, except for the Bankruptcy Proceeding, and, subject to the Sale Order, this Contract, and the covenants and agreements of Seller under this Contract, are the valid and binding obligations of Seller, enforceable in accordance with their terms.

(e)    There are no pending or, to the actual knowledge of Seller, threatened or contemplated condemnation actions involving all or any portion of the Property; and, to the actual knowledge of Seller, there are no existing, proposed or contemplated plans to widen, modify or realign any public rights-of-way located adjacent to any portion of the Real Property.

(f)    There are no management, maintenance, service or other contracts with respect to the Property.

(g)    Between the date hereof and the Closing Date, Seller shall not make or enter into any lease or other agreement for the use, occupancy or possession of all or any part of the Property or extend or exercise any option to extend any Lease without the prior written approval of Purchaser.

(h)    There are no leases or other agreements for use, occupancy or possession presently in force with respect to all or any portion of the Property.

(i)    To the actual knowledge of Seller and except as disclosed in the reports listed in Exhibit "F", the Property is not in violation of, and Seller has received no notice of any violation or potential violation of, any zoning, building, health, environmental or other laws, codes, ordinances, regulations, orders or requirements of any city, county, state or other governmental authority having jurisdiction thereof, or any private restrictive covenants affecting the Property.

Except as provided in this Section 15 and in the Deed, Purchaser acknowledges and agrees that Seller has not made, does not make and specifically negates and disclaims any and all representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (a) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology

10

US2000 12006236.11

thereof, (b) the income derived or to be derived from the Property, (c) the suitability of the Property for any and all activities and uses that Purchaser may conduct thereon, (d) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body, (e) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property, (f) the manner or quality of the construction or materials, if any, incorporated into the Property, (g) the manner, quality, state of repair or lack of repair of the Property, or (h) any other matter with respect to the Property, including but not limited to the title thereto (except and to the extent, if any, that any warranty of title is expressly set forth in this Contract), and that Seller has not made, does not make and specifically disclaims any and all representations regarding compliance with any environmental protection, pollution or land use laws, rules, regulations, permits, orders or requirements, including solid waste, as defined by the U.S. Environmental Protection Agency regulations at 40 C.F.R. Part 261, or the presence or absence, in or on the Property, of any substance or material, including but not limited to any hazardous substance, as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and regulations promulgated thereunder, asbestos, asbestos-containing materials, PCB's, radon gas, urea formaldehyde foam insulation or any other substance or material. Purchaser further acknowledges and agrees that having been given the opportunity to inspect the Property, Purchaser is relying solely on Purchaser's own investigation of the Property and not on any information provided or to be provided by Seller. Purchaser further acknowledges and agrees that any information provided or to be provided with respect to the Property was obtained from a variety of sources and that Seller has not made any independent investigation or verification of such information and makes no representations as to the accuracy or completeness of such information. Seller is not liable or bound in any manner by any oral or written statements, representations or information pertaining to the Property, or the operation, management or leasing thereof, furnished by any real estate broker, agent, employee, servant or other person. Purchaser further acknowledges and agrees that to the maximum extent permitted by law, the sale of the Property as provided for herein is made on an "as is" condition and basis with all faults. It is understood and agreed that the purchase price has been negotiated to reflect that all of the Property is sold by Seller and purchased by Purchaser subject to the foregoing and the acknowledgements and agreements of Purchaser in Section 16.

16.  Resource Conservation and Recovery Act ("RCRA") Permit. In addition to the acknowledgements and agreements of Purchaser in Section 15, Purchaser further acknowledges and agrees that Searle formerly owned the Property and used the Property for the manufacture of pharmaceutical ingredients. The GEPD issued a RCRA Permit to Searle in 1987 governing, among other things, the generation and storage of certain hazardous wastes and hazardous substances. As the owner of the Property, Seller is currently a co-permittee on the RCRA Permit with Searle. Purchaser further acknowledges and agrees that releases of certain hazardous wastes and hazardous substances have occurred at the Property and that Searle has been and is currently conducting remediation and closure activities at the Property pursuant to the RCRA Permit and under the supervision of GEPD.

11

17. <u>Damage and Destruction</u>.  Between the Effective Date and Closing, the risks and obligations of ownership and loss of the Property and the correlative rights against insurance carriers and third parties shall belong to Seller.  In the event of any material damage or destruction of any material portion of the Property prior to Closing, Purchaser shall have the right, at Purchaser's option, to terminate this Contract by giving written notice thereof to Seller prior to Closing, in which event the Earnest Money shall be refunded to Purchaser immediately upon request, all rights and obligations of Seller and Purchaser under this Contract shall expire, and this Contract shall become null and void. If Purchaser does not so terminate this Contract, the Purchase Price shall be reduced by the total of any insurance proceeds received by Seller prior to Closing by reason of such damage or destruction and by the amount of any deductible applicable to the policy of insurance, and, at Closing, Seller shall assign to Purchaser all insurance proceeds to be paid or to become payable after Closing by reason of such damage or destruction.  As used in this Section 17,"material" means a casualty that results in damages to the property in excess of $500,000.00.  Seller represents and warrants that it maintains and shall maintain until the Closing Date, insurance in an amount not less than the full replacement cost of the Improvements against direct and indirect loss by fire and all other casualties and risks covered under "All Risk" insurance.

18. <u>Condemnation</u>.  In the event of the taking of all or any material part of the Property, by eminent domain proceedings, or the commencement or *bona fide* threat of the commencement of any such proceedings, prior to Closing, Purchaser shall have the right, at Purchaser's option, to terminate this Contract by giving written notice thereof to Seller prior to Closing, in which event the Earnest Money shall be refunded to Purchaser immediately upon request, all rights and obligations of Seller and Purchaser under this Contract shall expire, and this Contract shall become null and void.  If Purchaser does not so terminate this Contract, the Purchase Price shall be reduced by the total of any awards or other proceeds received by Seller prior to Closing with respect to any taking.  Seller shall notify Purchaser of eminent domain proceedings within five (5) days after Seller learns thereof.  As used in this Section 18, "material" means a taking of (a) more than twenty (20%) of the gross area of the Real Property; or (b) any Real Property which would, in Purchaser's reasonable opinion, prevent the location and construction of a road fifty feet (50') in width connecting the Real Property to other real property owned by Purchaser and commonly known as 1 Columbia Nitrogen Road; or (c) any portion of the Real Property that results in a lack of direct access from the Real Property to a publicly dedicated right of way.

19. <u>Remedies</u>.

    (a)    If the purchase and sale of the Property is not consummated in accordance with the terms and conditions of this Contract due to circumstances or conditions which constitute a default by Purchaser under this Contract, the Earnest Money shall be delivered to Seller as full liquidated damages for such default.  Seller and Purchaser acknowledge that Seller's actual damages in the event of a default by Purchaser under this Contract will be difficult to ascertain, that such liquidated damages represent Seller's and Purchaser's best estimate of such damages, and

12

that Seller and Purchaser believe such liquidated damages are a reasonable estimate of such damages. Seller and Purchaser expressly acknowledge that the foregoing liquidated damages are intended not as a penalty, but as full liquidated damages, as permitted by O.C.G.A. § 13-6-7, in the event of Purchaser's default and as compensation for Seller's taking the Property off the market during the term of this Contract. Such delivery of the Earnest Money shall be the sole and exclusive remedy of Seller by reason of a default by Purchaser under this Contract, and Seller hereby waives and releases any right to sue Purchaser, and hereby covenants not to sue Purchaser, for Seller may proceed to enforce its rights, hereunder including specific performance of this Contract or to prove that Seller's actual damages exceed the Earnest Money which is herein provided Seller as full liquidated damages.

(b)    Unless otherwise provided in this Contract, if (i) any material representation or warranty of Seller set forth in this Contract shall prove to be materially untrue or incorrect in any respect, or (ii) Seller shall fail to materially keep, observe, perform, satisfy or comply with, fully and completely, any of the material terms, covenants, conditions, agreements, requirements, restrictions or provisions required by this Contract to be kept, observed, performed, satisfied or complied with by Seller, or (iii) the purchase and sale of the Property is otherwise not consummated in accordance with the terms and provisions of this Contract due to circumstances or conditions which constitute a default by Seller under this Contract (the matters described in the foregoing clauses (i), (ii) and (iii) being herein sometimes collectively called the "Seller Defaults"), the Earnest Money shall be refunded to Purchaser immediately upon request, and Purchaser may exercise such rights and remedies as may be provided for in this Contract or as may be provided for or allowed by law or in equity.

20.   Brokers and Finders.

(a)    All negotiations relative to this Contract and the purchase and sale of the Property as contemplated by and provided for in this Contract have been conducted by and between Seller and Purchaser without the intervention of any person or other party as agent or, with the exception of the Broker. Seller, Purchaser and Broker warrant and represent to each other that, other than with regard to Broker, Seller and Purchaser have not entered into any agreement or arrangement and have not received services from any broker or broker's employees or independent contractors which would give rise to any claim of lien or lien against the Property pursuant to the Broker Lien Act, and there are and will be no broker's commissions or fees payable in connection with this Contract or the purchase and sale of the Property by reason of their respective dealings, negotiations or communications, except the commission payable to Broker by Seller in accordance with the terms and provisions of Section 20(b), below. Purchaser shall in no event be responsible or liable for the payment of any commission or fee to Broker in connection with the purchase and sale of the Property. Broker agrees that, notwithstanding anything to the contrary contained in this Contract, if

13

the purchase and sale of the Property is not consummated in accordance with this Contract, regardless of the reason or the party at fault, and regardless of whether such failure results from the misconduct, bad faith act or breach or default of a party under this Contract, no commission, fee or other charge shall have been earned by or be payable to Broker, and neither Seller nor Purchaser shall be obligated or liable to Broker for any commission, fee or other charge of any kind in regard to this Contract or the purchase and sale of the Property. If the purchase and sale of the Property is consummated in accordance with this Contract, payment of the commission specified in Section 20(b), below, shall constitute full and complete payment and satisfaction of any and all commissions, fees, charges and claims of Broker and Broker's agents, employees, representatives and affiliates arising from, in connection with or with respect to this Contract and the purchase and sale of the Property. Broker acknowledges that Broker is a party to this Contract for the sole purpose of setting forth Broker's rights to the payment of a commission or fee in connection with the purchase and sale of the Property and Broker's covenants as contained in this Section 20. Broker agrees that Broker has no other rights with respect to the payment of a commission or fee in connection with this Contract or the purchase and sale of the Property, except as specifically set forth in this Section 20. Seller, Purchaser and Broker shall and do each hereby indemnify, defend and hold harmless each of the others from and against the claims, demands, actions and judgments of any and all brokers, agents and other intermediaries alleging a commission, fee or other payment to be owing by reason of their respective dealings, negotiations or communications in connection with this Contract or the purchase and sale of the Property.

(b)     Broker has acted as agent for Seller in this transaction and is to be paid a commission pursuant to a separate agreement with Seller.

(c)     Broker agrees to provide at Closing a sworn affidavit with respect to the payment in full of all compensation due Broker in connection with the transactions contemplated by this Contract and waiving and releasing any and all lien rights under the Broker Lien Act, and running in favor of Purchaser, Seller and the Title Company.

21.     Notices. Any notice required or permitted to be delivered hereunder shall be in writing, signed by the party giving such notice or its attorney at law and shall be deemed to be delivered, whether or not actually received, (a) three (3) business days after the same has been deposited in the United States mail, postage prepaid, registered or certified mail, return receipt requested, addressed to the party to whom such notice is sent, (b) when personally delivered by commercial courier service or other messenger or (c) when transmitted by facsimile evidenced by a confirmed receipt. For purposes of notice, the addresses of the parties, until changed as hereinafter provided, are as follows:

14

As to Seller:              Robert L. Franklin in the capacity as Liquidating Trustee
                           Pierce Atwood, LLP
                           100 Summer Street
                           Boston, MA 02110
                           Fax: 617-824-2020
                           Attention:  Gayle P. Ehrlich, Esq.

With copy to:              Randall D. Quintrell, P.C.
                           999 Peachtree Road, NE
                           Suite 2300
                           Atlanta Georgia 30309
                           Fax:  404-853-8806
                           Attention:  Randall D. Quintrell, Esq.

As to Purchaser:           DSM Chemicals North America, Inc.
                           1 Columbia Nitrogen Road
                           P.O. Box 2451
                           Augusta, Georgia  30903
                           Fax:  706-849-6999
                           Attention:  David D. Quester

with copy to:              45 Waterview Boulevard
                           Parsippany, New Jersey
                           Fax:  973-257-8312
                           Attention:  James Philip Spielberg, Esq.

                           and

                           Kilpatrick Townsend & Stockton LLP
                           1100 Peachtree Street, NE
                           Suite 2800
                           Atlanta, Georgia  30309
                           Fax: 404-541-3198
                           Attention:  Jeremy J. Hilsman, Esq.

22.    <u>Successors and Assigns</u>.  This Contract shall inure to the benefit of and be binding upon
       the parties hereto, their heirs, successors, administrators, executors and assigns.  This
       Contract may be assigned by Purchaser to an affiliate or any entity directly or indirectly
       owned by Purchaser, and any such assignment shall relieve Purchaser of liability for the
       performance of Purchaser's duties and obligations under this Contract.  Nothing in this
       Contract, express or implied, is intended to confer upon anyone other than the parties to
       the Contract any rights or remedies under or by reason of this Contract.

                                          15

23.    <u>Captions</u>.  Titles or captions of articles, paragraphs or sections contained in this Contract are inserted only as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Contract or the intent of any provision hereof.

24.    <u>Counterparts; Facsimile and PDF as Writing</u>.  This Contract may be executed in any number of counterparts, each of which shall be an original, but such counterparts shall together constitute one and the same instrument.  Purchaser and Seller expressly acknowledge and agree that, notwithstanding any statutory or decision law to the contrary, the printed product of a facsimile transmittal or electronic transmittal of a .pdf shall be deemed to be "written" or a "writing" for all purposes of this Contract.

25.    <u>Entire Agreement; Modification</u>.  This Contract constitutes the sole and entire agreement between the parties hereto and no modification of this Contract shall be binding unless attached hereto and signed by Seller and Purchaser.  No representation, promise, or inducement not included in this Contract shall be binding upon any party hereto.  This Contract shall not be modified or amended except by an instrument in writing executed by or on behalf of Seller and Purchaser; provided, however, that, if and only if any such modification or amendment alters the amount of Broker's commission (if the commission is stated as a fixed amount), the method of calculation of Broker's commission (if the commission is stated as a percentage of the Purchase Price), or the method of payment of Broker's commission, such instrument shall be executed by or on behalf of Broker.

26.    <u>Time of Essence; Dates</u>.  Time is of the essence of each and every provision and stipulation of this Contract.  If any date set forth in this Contract shall fall on, or any time period set forth in this Contract shall expire on, a day which is a Saturday, Sunday, federal or Georgia state holiday, or other non-business day, such date shall automatically be extended to, and the expiration of such time period shall automatically to be extended to, the next day which is not a Saturday, Sunday, federal or state holiday or other non-business day.  In addition, and notwithstanding any provision of this Contract to the contrary, in the event the Closing Date is (i) a Friday, Saturday, Sunday or federal or Georgia state holiday, then the Closing Date shall be the second consecutive business day thereafter; or (ii) a Monday that is not a federal or Georgia state holiday, then the Closing Date shall be the next succeeding business day thereafter.  The final day of any time period under this Contract or any deadline under this Contract shall be the specified day or date, and shall include the period of time through and including such specified day or date.

27.    <u>Applicable Laws</u>.  All rights, duties and responsibilities under this Contract shall be construed according to the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Georgia.

28.    <u>No Implied Waiver</u>.  No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of its obligations under this Contract shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other party of the same or any other obligation of such other party under this Contract.  Failure on the part of any party

16

to complain of any act or failure to act of the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights under this Contract.

29.    Number and Gender.  All personal pronouns used in this Contract, whether in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural; and the plural shall include the singular.

30.    No Third Party Beneficiaries.  Under no circumstances shall anyone who or which is not a party to this Contract be entitled to enforce any of the provisions hereof against any party hereto.

31.    Interpretation.  No provision of this Contract shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party's having or being deemed to have drafted, structured, dictated or required such provision.

32.    Attorneys' Fees.  In the event of any litigation between Purchaser and Seller arising under or in connection with this Contract, the prevailing party shall be entitled to recover from the other party the expenses of litigation (including reasonable attorneys' fees, expenses and disbursements) incurred by the prevailing party.  For purposes of this Section 32, the phrase "prevailing party" shall mean the party who receives substantially the relief desired, whether by dismissal, summary judgment, judgment, settlement or otherwise.

33.    Counsel.  Each party hereto warrants and represents that each party has been afforded the opportunity to be represented by counsel of its choice in connection with the execution of this Contract, and has had ample opportunity to read, review and understand the provisions of this Contract.

34.    No Construction Against Preparer.  No provision of this Contract shall be construed against or interpreted to the disadvantage of any party by any court or other governmental or judicial authority by reason of such party's having or being deemed to have prepared or imposed such provision.

35.    Effective Date.  As used herein, the "Effective Date" shall be deemed to refer to the later of the date of Purchaser's or Seller's receipt of a fully executed copy by facsimile, electronic transmittal of a .pdf or otherwise of this Contract.

36.    Definitions.  For purposes of this Contract, capitalized terms shall have the meaning assigned below:

A.    "Access Agreement" means that certain Access and Cooperation Agreement dated as of August 22, 2006, among Augusta Biofuels, LLC, CoastalXethanol, LLC, G.D. Searle LLC and Pfizer Inc.

US2000 12006236.11

B.  "Alternate Sale" means if Seller consummates a sale of the Property at the auction to an entity other than Purchaser, pursuant to the Sale Motion.

C.  "Appeal" means request for stay, motion or petition for reconsideration or rehearing, application or request for review or reconsideration.

D.  "Authority Documentation" means evidence in form and substance satisfactory to Purchaser and to the Title Company that Seller has the power and authority to execute and enter into this Contract and to consummate the sale of the Property, and that any and all actions required to authorize and approve the execution of and entry into this Contract by Seller, the performance by Seller of all of Seller's duties and obligations under this Contract, and the execution and delivery by Seller of all documents and other items to be delivered to the Title Company or Purchaser at Closing have been accomplished.

E.  "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

F.  "Bankruptcy Proceeding" means the cases jointly administered under Case No. 09-14192 (PJW) pending in the Bankruptcy Court.

G.  "Breakage Fee" means Purchaser shall be paid a break-up fee equal to the lesser of: (x) five percent (5%) of the Purchase Price and (y) all actual out-of-pocket costs and expenses paid or incurred by Purchaser in connection with its execution of and entry into this Contract and its proposed acquisition of the Property, including, without limitation, (i) attorneys' fees and disbursements in connection with the negotiation and execution of this Contract, the examination of title to the Property, and any other legal matter undertaken by or on behalf of Purchaser pertaining to the Property, and (ii) any examinations, investigations, tests and inspections, undertaken by or on behalf of Purchaser with respect to the Property.

H.  "Broker" means Grubb and Ellis Company.

I.  "Broker Lien Act" means to the Georgia Commercial Real Estate Broker Lien Act, O.C.G.A. § 44-14-600 et seq.

J.  "Code" means the United States Bankruptcy Code 11 U.S.C. §§ 101 et seq., as it may be amended.

K.  "Confirmation Order" shall mean that certain Findings of Fact, Conclusions of Law and Order Confirming Amended Chapter 11 Plan of Reorganization of Global Energy Holdings Group, Inc., Augusta Biofuels, LLC, Spring Hope Biofuels, LLC, Xethanol Biofuels, LLC and GES Live Oak Hickory Ridge, LLC issued on October 26, 2010.

L.  "Contract" means this Contract for the Purchase and Sale of Real or Personal Property.

18

M.   "Closing" means the occurrence of the exchange of the Purchase Price in exchange for the Property pursuant to this Contract.

N.   "Closing Date" shall have the meaning ascribed in Section 8.

O.   "Closing Statement" means a statement itemizing and approving all receipts and disbursements in accordance with this Contract made in connection with the Closing.

P.   "Conservation Easement" means that certain Deed of Conservation Easement from Seller to Central Savannah River Land Trust, Inc., dated September 14, 2006, recorded at Realty Reel 1078, page 1924-1940 in the Office of the Clerk of Superior Court of Richmond County, Georgia.

Q.   "Deed" means a limited warranty deed in recordable form conveying to Purchaser good and marketable fee simple title to the Real Property and Improvements subject only to the Permitted Exceptions.

R.   "Earnest Money" means $250,000, together with all interest actually earned thereon during the term of this Contract.

S.   "Easement Agreement" means the "Easement and Operating Agreement" dated May 19, 2000 by and among Pharmacia Corporation, Searle, and NSC Operating Company as amended from time to time.

T.   "Effective Date" means the later of the date of Purchaser's or Seller's receipt of a fully executed copy by facsimile, electronic transmittal of a .pdf or otherwise of this Contract.

U.   "Escrow Agent" means First American Title Insurance Company.

V.   "Final Order" means a Sale Order (i) which has not been reversed, stayed, enjoined, set aside, annulled or suspended, (ii) in relation to which no request for an Appeal is pending or has been granted; and (iii) as to which the prescribed time for filing an Appeal has expired.

W.   "GEPD" means The Georgia Environmental Protection Division.

X.   "Governmental Authority" means any federal, state, county or municipal government or any political subdivision, department, board, bureau or agency thereof.

Y.   "Investment Instructions" means one or more national banks: (i) whose depositors are insured by the Federal Deposit Insurance Corporation and (ii) that otherwise meets the requirements of the instructions attached hereto as Exhibit "E"

Z.   "Monetary Encumbrance" means a lien, deed to secure debt, mortgage, deed of trust, judgment or other liquidated sum.

19

AA.     "Permitted Exceptions" means: (i) current city, state and counts ad valorem taxes not yet due and payable; (ii) any matter reflected in Schedule B, Section II of the Title Report; and (iii) all matters described on Exhibit "G" attached hereto.

BB.     "Personal Property" means all furniture, equipment and personal property located upon the Real Property, including, without limitation, the personal property listed on Exhibit "B" attached hereto, as of the Closing.

CC.     "Purchase Price" means $2,500,000.

DD.     "Purchaser" shall have the meaning ascribed in the preamble paragraph.

EE.     "Quitclaim Deed" means a deed in recordable form conveying to Purchaser Seller's interest in and to the Real Property as described in any survey of the Real Property commissioned by Purchaser

FF.     "RCRA Permit" means the RCRA Hazardous Waste Facility Permit No. HW-048(ST).

GG.     "Sale Order" means an order of the Bankruptcy Court approving Purchaser's purchase of the Property on the terms and conditions set forth in and contemplated by this Contract which order shall be in the form attached hereto as Exhibit "K".

HH.     "Sale Motion" means the motion Seller will file with the Bankruptcy Court seeking issuance of the Sale Order.

II.     "Searle" means to G.D. Searle & Co.

JJ.     "Seller" shall have the definition ascribed in the preamble paragraph.

KK.     "Seller's Affidavit" means the affidavit and/or indemnification agreements that Seller shall deliver at Closing sufficient to cause the Title Policy to be issued without exception for parties or tenants in possession, for mechanic's, laborer's or materialman's liens, or for any "gap".

LL.     "Title Company" means First American Title Insurance Company.

MM.     "Title Report" means the title commitment obtained by Purchaser from Title Company (File Number NCS 480695) with an effective date of March 21, 2011.

NN.     "Utilities" and severally, a "Utility" means the meters of any electric service, telephone service, water service, sewer service, cable television service, and natural gas service.

**[Signatures on following page]**

20

US2000 12006236.11

IN WITNESS WHEREOF, the parties hereto have executed this Contract under seal the day and year first above written.

SELLER:

By: _____

Robert L. Franklin in his capacity as Liquidating Trustee of the substantively consolidated post-effective estates of Global Energy Holdings Group, Inc., et al.

Date of Execution: May 10, 2011

PURCHASER:

DSM CHEMICALS NORTH AMERICA, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

Date of Execution: May __, 2011

IN WITNESS WHEREOF, the parties hereto have executed this Contract under seal the day and year first above written.

**SELLER:**

By:_____
      Robert L. Franklin in his capacity as Liquidating Trustee of the substantively consolidated post-effective estates of Global Energy Holdings Group, Inc., et al.

Date of Execution: _____, 2011

**PURCHASER:**

DSM CHEMICALS NORTH AMERICA, INC., a Delaware corporation

By:_____
Name:_____David D. Quester_____
Title:_____President_____

Date of Execution: May 10, 2011

**[Signatures continued from previous page]**

Broker acknowledges and agrees that Broker is executing this Contract for the sole purpose of acknowledging and agreeing to be bound by the terms and conditions of Section 20 and 25 hereof.

**BROKER:**

Grubb & Ellis Company, a Delaware corporation

By: _Jim Simpson_ _CA Lic SE# 235_
Name: _Jim Simpson_
Title: _P/D_

_GRUBB ELLIS Co. CA LICENSE # -0336_

Initial address for notices:

Grubb & Ellis Company
3424 Peachtree Road, NE
Suite 800
Atlanta, Georgia 30326
Attention: H. Allen Brown

_CA LICENSE # 886C_

**[Signatures continued on following page]**

US2000 12000236.10

**[Signatures continued from previous page]**

Escrow Agent acknowledges receipt of the Earnest Money, and agrees to hold and disburse the Earnest Money in accordance with the terms and conditions of this Contract.

ESCROW AGENT:

FIRST AMERICAN TITLE INSURANCE COMPANY

By: _____
Name: Deborah Goodman
Title: Vice President, Sales and Relationship Manager

Initial address for notices:

Six Concourse Parkway
Suite 2000
Atlanta, GA 30328
Attention: Deborah Goodman
Telephone Number: (770) 390-6510
Facsimile Number: (866) 735-3071

US2000 12006216.11

EXHIBIT "A"

REAL PROPERTY

Tract B-1 (containing 30.28 acres, more or less), as shown in Deed Book/Plat Book 706, Page 982, Richmond County, Georgia Superior Court Records, also being shown and depicted as Tax Parcel 102-0-003-02-0 on the official tax maps of Augusta-Richmond County, Georgia.

Said tract is also described as:

ALL THAT TRACT OF LAND LYING, SITUATE, AND BEING LOCATED IN THE COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN RIGHT-OF-WAY OF LOVERS LANE, SAID REBAR BEING S21°16'05"W 8479.87', S24°19'23"W 54.57' FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN BOULEVARD AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.
THENCE LEAVING SAID RIGHT-OF-WAY S61°39'42"E 450.94' TO A #4 REBAR;
THENCE S28°33'13"W 160.76' TO A #4 REBAR;
THENCE S61°26'47"E 555.00', TO A #4 REBAR;
THENCE N28°33'13"E 343.81' TO A #4 REBAR;
THENCE S68°47'57"E 197.04' TO A #4 REBAR;
THENCE N28°44'28"E 54.82' TO A #4 REBAR;
THENCE N37°56'13"E 138.61' TO A #4 REBAR;
THENCE N28°41'13"E 1020.92' TO A #4 REBAR;
THENCE N75°34'03"E 37.06' TO A #4 REBAR;
THENCE N75°34'03"E 41.06' TO A #4 REBAR;
THENCE S28°41'08"W 1278.93' TO A #4 REBAR;
THENCE N75°41'37"W 26.48' TO A #4 REBAR;
THENCE S28°42'20"W 1454.43' TO A #4 REBAR;
THENCE N61°25'52"E 219.60' TO A #4 REBAR;
THENCE N28°34'06"E 274.00' TO A #4 REBAR;
THENCE N60°58'46"W 413.60' TO A #4 REBAR;
THENCE N61°47'57"E 260.34' TO A #4 REBAR;
THENCE S27°31'43"W 14.15' TO A #4 REBAR;
THENCE N61°54'38"W 18.65' TO A #4 REBAR;
THENCE N29°24'18"E 13.14' TO A #4 REBAR;
THENCE N61°51'06"W 111.50' TO A #4 REBAR;
THENCE S27°59'20"W 52.29' TO A #4 REBAR;
THENCE N61°35'48"W 64.56' TO A #4 REBAR;
THENCE N28°01'40"E 52.47' TO A #4 REBAR;
THENCE N61°26'21"W 208.25' TO A #4 REBAR;
THENCE N22°42'16"E 99.83' TO A #4 REBAR;
THENCE N86°46'08"W 135.88' TO A #4 REBAR;
THENCE N24°19'23"E 821.30' TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 30.28 ACRES.

LESS AND EXCEPT:

ALL THAT TRACT OF LAND LYING, SITUATE, AND BEING LOCATED IN THE COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR, SAID REBAR BEING S09°40'54"W 7367.31' FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN BOULEVARD AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.
THENCE S28°41'08"W 1292.53' TO A #4 REBAR;
THENCE N75°41'37"W 20.65' TO A #4 REBAR;
THENCE N28°41'08"E 1278.93' TO A #4 REBAR;
THENCE N75°34'03"E 27.40' TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.59 ACRES.

Tract B-3 (containing 10.6 acres, more or less) as shown in Deed Book/Plat Book 119, Pages 2011-2018, Richmond County, Georgia Superior Court Records, also being shown and depicted as Tax Parcel 102-0-002-01-0 on the official tax maps of Augusta-Richmond County, Georgia.

Said tract is also described as:

ALL THAT TRACT OF LAND LYING, SITUATE, AND BEING LOCATED IN THE COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR ON THE EASTERN RIGHT-OF-WAY OF THE AUGUSTA LEVEE, SAID REBAR BEING S11°11'33"W 9893.76' FROM THE CENTERLINE INTERSECTION OF COLUMBIA NITROGEN BOULEVARD AND LANEY WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.
THENCE ALONG SAID RIGHT-OF-WAY N28°40'53"E 1059.10' TO A CONCRETE MONUMENT;
THENCE LEAVING SAID RIGHT-OF-WAY S67°43'49"E 277.71' TO A CONCRETE MONUMENT;
THENCE S67°43'49"E 22.16' TO THE MEAN LOW WATER MARK OF THE SAVANNAH RIVER;
THENCE AS SAID MEAN LOW WATER MARK S08°29'20"W 125.63', S01°39'44"W 155.64', S00°49'48"W 206.95', S04°09'11"E 104.49', S03°25'27"E 200.17' TO A POINT;
THENCE LEAVING SAID MEAN LOW WATER MARK S88°21'11"W 32.55' TO A #4 REBAR;
THENCE S88°21'11"W 745.93' TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 10.60 ACRES.

US2000 12006236.11

EXHIBIT "B"

PERSONAL PROPERTY

All furniture, equipment and personal property located upon the Real Property as of the Effective Date.

US2000 12006236.11

EXHIBIT "C"

INTANGIBLE PROPERTY

None

<u>EXHIBIT "D"</u>

ESCROW PROVISIONS

1.    Except as otherwise provided below in Section 2-5, in performing any of its duties hereunder, Escrow Agent shall not incur any liability to anyone for any damages, losses or expenses, including, without limitation (a) any action taken or omitted upon advice of its legal counsel given in good faith with respect to any questions relating to the duties and responsibilities of Escrow Agent under this Contract; or (b) any action taken or omitted in reliance upon any instrument, including any written notice or instruction provided for in this Contract.  Escrow Agent may rely upon any instrument, pursuant to clause (b) in the preceding sentence, as being duly executed, valid and effective, and as containing accurate information and genuine signatures.

2.    Notwithstanding anything in this Contract to the contrary, in the event of a dispute between Seller and Purchaser arising prior to or at the time of the delivery or other disposition of the Earnest Money by Escrow Agent pursuant hereto, which dispute shall be sufficient, in the sole discretion of Escrow Agent, to justify its doing so, Escrow Agent shall be entitled to tender the Earnest Money into the registry or custody of any court of competent jurisdiction, together with such legal pleadings as it may deem appropriate, and thereupon Escrow Agent shall be discharged from all further duties and liabilities under this Contract.  Any such legal action may be brought in such court as Escrow Agent shall determine to have jurisdiction thereof.  Escrow Agent's determination of whether a dispute exists between Seller and Purchaser shall be binding and conclusive upon all parties hereto, notwithstanding any contention that no dispute exists.  All costs and expenses incurred by Escrow Agent in taking any action pursuant to this paragraph 2 shall be covered by and paid pursuant to the indemnification of Escrow Agent contained in the following paragraph 3.

3.    Purchaser and Seller shall, and do hereby, jointly and severally indemnify, defend and hold Escrow Agent harmless from, against and in respect of: (a) any and all demands, judgments, expenses, costs, losses, injuries or claims of any kind whatsoever whether existing on the date hereof or hereafter arising, incurred by Escrow Agent by reason of, from or in connection with this Contract or any action taken or not taken by Escrow Agent under or in connection with this Contract, except to the extent caused by Escrow Agent's misconduct or negligence, or by Escrow Agent's negligent mishandling of funds; and (b) any and all counsel fees, expenses, disbursements of counsel, amounts of judgments, demands, assessments, costs, fines or penalties, and amounts paid in compromise or settlement, incurred or sustained by Escrow Agent by reason of, in connection with or as a result of any claim, demand, action, suit, investigation or proceeding (or any appeal thereof or relating thereto or other review thereof) incident to the matters covered by the immediately preceding clause (a), except to the extent caused by Escrow Agent's misconduct or negligence, or by Escrow Agent's negligent mishandling of funds.

4.    If Escrow Agent shall notify Seller and Purchaser of its desire to be relieved of any further duties and liabilities hereunder, then Escrow Agent shall deliver the Earnest Money to a successor escrow agent designated by Seller and Purchaser.  If Seller and

Purchaser shall fail to agree upon and designate a successor escrow agent within ten (10) days after having been requested by Escrow Agent to do so, then Escrow Agent shall in its discretion designate the successor escrow agent. The successor escrow agent designated by Seller and Purchaser or by Escrow Agent, as the case may be, shall be a title insurance company, bank or trust company having trust powers in good standing and located in the Augusta, Georgia, metropolitan area, and shall agree to be bound by all the terms and conditions of this Contract. Immediately upon agreement by the successor escrow agent to be bound by all the terms and conditions of this Contract, the original Escrow Agent shall be relieved of any and all duties and liabilities under or in connection with this Contract; provided, however, that no successor escrow agent shall assume any liability for the acts or omissions of its predecessor escrow agent(s) hereunder.

5.    The agency created in Escrow Agent hereby is coupled with an interest of Seller and Purchaser and shall be binding upon and enforceable against the respective heirs, successors, legal representatives and assigns of Seller and Purchaser. This agency shall not be revoked or terminated by reason of the death, incompetency, dissolution or liquidation of Seller or Purchaser, but shall continue to be binding upon and enforceable against the respective successors, legal representatives and assigns of Seller and Purchaser in the manner provided herein. In the event of the death, incompetency, dissolution or liquidation of Seller or Purchaser, Escrow Agent may rely and act upon any notices permitted or required to be given hereunder from any person, firm, partnership or corporation believed by Escrow Agent in good faith to be the successor, legal representative or assign of such dissolved or liquidated party.

<u>EXHIBIT "E"</u>

INVESTMENT INSTRUCTIONS

All funds deposited with Escrow Agent shall be held in accounts established with national or state banks having a long-term senior debt rating by Standard & Poors Corporation of at least "A" (or at least an equivalent rating issued by Moody's Investors Service, Inc.).

EXHIBIT "F"

ENVIRONMENTAL REPORTS

**EXHIBIT "F"**
**ENVIRONMENTAL REPORTS**

1.   RCRA Facility Assessment:   G.D. Seale and Company; prepared by Georgia Environmental Protection Division; revised July 2002

2.   RCRA Part A Application; revised September 3, 2004

3.   Report on Detailed Divestiture Environmental Site Assessment; G.D. Searle; December 2004

4.   Access and Cooperation Agreement dated August 22, 2006

5.   SWMU Corrective Action Permit Application; May 2008

6.   Report on Final RCRA Facility Investigation (Revision 7); January 2009

7.   Corrective Action to Clean Close SWMU 3; March 2009

8.   Letter from Georgia Environmental Protection Division to Pfizer Regarding: SWMU Corrective Action Permit Application; May 13, 2009

9.   Letter from Pfizer to Georgia Environmental Protection Division; Response to SWMU Corrective Action Permit Application Notice of Deficiency; June 12, 2009

10.   Letter from Georgia Environmental Protection Division to Pfizer Regarding RCRA Facility Investigation Report; January 25, 2010

11.   SWMU 5 Ozone Sparging System Closeout Report; March 2010

12.   Letter from Georgia Environmental Protection Division to Pfizer Regarding RCRA Closure of Permitted Units; March 19, 2010

13.   Letter from Pfizer to Georgia Environmental Protection Division Regarding RCRA Facility Investigation Report; March 25, 2010

14.   Site-Wide Groundwater Monitoring Plan; July 2010

15.   SWMU Correction Action Permit Application; July 2010

<u>EXHIBIT "G"</u>

TITLE MATTERS

1. Easement in favor of American Telephone and Telegraph Company of Georgia, dated December 1, 1929, recorded at Deed Book 11-U, page 356, in the Office of the Clerk of Superior Court of Richmond County, Georgia.

2. Terms and provisions of that certain Right of Way and Agreement from Georgia Power Company to Atlantic Coast Line Railroad Company, dated March 20, 1963, recorded at Book 29-C, page 472, assigned from Georgia Power Company to Development Authority of Richmond County recorded at Deed Book 26, page 2029, all in aforesaid Clerk's Office.

3. Right of way deed in favor of Richmond County, Georgia dated October 21, 1964, recorded at Book 30-X, page 777 in aforesaid Clerk's Office.

4. Terms and provisions of that certain Agreement for use of property from Georgia Power Company in favor of Tennessee Corporation dated May 9, 1966 and recorded at Reel 32-T, page 468 – 473, as amended by document dated January 19, 1967 and recorded at Book 33-0, page 538 - 541, and further amended by Assignment of Interest of Georgia Power Company to Development Authority of Richmond County, Georgia dated September 23, 1973 and recorded at Reel 26, page 2031, all in aforesaid Clerk's Office.

5. Right of way deed in favor of Richmond County, Georgia recorded October 15, 1975 at Realty Reel 53, pages 564-565 in aforesaid Clerk's office.

6. Right of way deed in favor of Richmond County, Georgia dated April 26, 1977 and recorded at Realty Reel 81, pages 1753-1754 in aforesaid Clerk's office.

7. Easement rights granted in that certain of Grant of Easement in favor of the City Council of Augusta, Georgia and Agreement among said party, Development Authority of Richmond County, and G.D. Searle & Co. for water and sewer services, recorded at Deed Book 157, page 2262 - 2268, in aforesaid Clerk's Office, subject to reservation of right to use and occupy the easement area.

8. Easement from Nutrasweet in favor of Georgia Power Company dated October 31, 1989, recorded in Realty Reel 322, page 1016, in aforesaid Clerk's Office.

9. Terms and provisions of that certain Easement and Operating Agreement dated May 19, 2000, by and among Pharmacia Corporation, G. D. Searle & Co., and NSC Operating Company recorded in Realty Reel 687, page 2244-2289, as amended by instrument dated August 31, 2001 and recorded at Realty Reel 795, page 1349-1355, as assigned and assumed by Agreement between G. D. Searle, LLC and Augusta Biofuels, LLC, dated August 22, 2006, recorded at Realty Reel 1073, page 1470-1473, all in aforesaid Clerk's Office.

10. Drainage and other unrecorded easement rights as shown on that certain plat dated December 20, 1984, prepared for G. D. Searle & Company by Baldwin Cranston & Associates, Inc. which is recorded in Realty Reel 199, pages 2011-2014 in aforesaid Clerk's Office.

11. Terms and provisions of that Easement Agreement for use of area beneath power line rights of way from Georgia Power Company in favor of Development Authority of Richmond County dated recorded October 5, 1973 at Deed Book 26, page 2036 - 2041 in aforesaid Clerk's Office.

12. Terms and provisions of that Easement Agreement for use of area beneath power line rights of way from Georgia Power Company in favor of Development Authority of Richmond County dated December 2, 1974 and recorded at Deed Book 44, page 697 in aforesaid Clerk's office.

13. Terms and provisions of that Non-exclusive easement from Georgia Power Company to G.D. Searle & Co. to allow for access drive, landscaping and sewer and water lines on grantor's property, dated January 26, 2001, recorded at Deed Book 716, page 804 in Clerk's office.

14. Use Restrictions incorporated in the Limited Warranty Deed conveying title to Augusta Biofuels, LLC, recorded at Deed Book 1073, page 1440, in aforesaid Clerk's Office.

14. Deed of Conservation Easement from Augusta Biofuels, LLC to Central Savannah River Land Trust, Inc., dated September 14, 2006, recorded at Realty Reel 1078, page 1924-1940, in aforesaid Clerk's Office.

EXHIBIT "H"

FORM OF BILL OF SALE

**FOR VALUE RECEIVED**, the undersigned, _____ ("Seller"), does hereby sell, transfer and convey unto _____, a _____ (with its legal representatives, successors and assigns, "Purchaser") (the words "Seller" and "Purchaser" to include the neuter, masculine and feminine genders, and the singular and plural), all appliances, furniture, fixtures, machinery, equipment, inventories, supplies or other tangible personal property **(i)** now located on all that tract or parcel of land more particularly described on Exhibit "A", attached hereto and incorporated herein by reference, and **(ii)** used in connection with the operation, management or maintenance of the apartment project and related facilities situated on said land, including, without limitation, all property described on Exhibit "B", attached hereto and incorporated herein by reference (all of such property, collectively, the "Property").

Seller represents and warrants to Purchaser that Seller is the lawful owner of the Property, with the full power and authority to transfer title thereto, and that all of the Property is free and clear of any and all liens, encumbrances, security interests and charges of every nature whatsoever, attached hereto and incorporated herein by reference; and Seller shall warrant and forever defend the right and title to the Property unto Purchaser, and the successors, legal representatives and assigns of Purchaser, against the claims of all persons whomsoever. Seller covenants and agrees to execute and deliver to Purchaser such further instruments and documents as Purchaser may deem reasonably necessary or desirable to fully assign, transfer, convey or assure title to all of the Property unto Purchaser.

**IN WITNESS WHEREOF**, Seller, acting by and through its manager, has executed and sealed this Bill of Sale, and delivered this Bill of Sale to Purchaser, all this ____ of _____, 2011.

EXHIBIT "I"

LEGAL DESCRIPTION FOR GC DEED

LEGAL DESCRIPTION
PARCEL 1
ALL THAT TRACT OF LAND LYING, SITUATE, AND BEING LOCATED IN THE
COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR, SAID REBAR BEING S09°40'54"W 7367.31', S75°34'03"W
27.40', S75°34'03"W 41.06' FROM THE CENTERLINE INTERSECTION OF COLUMBIA
NITROGEN BOULEVARD AND LANEY WALKER BOULEVARD, SAID REBAR BEING
THE POINT OF BEGINNING.
THENCE S28°41'13"W 880.16' TO A #4 REBAR;
THENCE S37°56'13"W 168.28' TO A #4 REBAR;
THENCE N28°41'13"E 1020.92' TO A #4 REBAR;
THENCE N75°34'03"E 37.06' TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.59 ACRES.

EXHIBIT "J"

LEGAL DESCRIPTION FOR ABF DEED

LEGAL DESCRIPTION
PARCEL 2
ALL THAT TRACT OF LAND LYING, SITUATE, AND BEING LOCATED IN THE
COUNTY OF RICHMOND, STATE OF GEORGIA, AND BEING MORE PARTICULARLY
DESCRIBED AS FOLLOWS:

BEGINNING AT A #4 REBAR, SAID REBAR BEING S09°40'54"W 7367.31' FROM THE
CENTERLINE INTERSECTION OF COLUMBIA NITROGEN BOULEVARD AND LANEY
WALKER BOULEVARD, SAID REBAR BEING THE POINT OF BEGINNING.
THENCE S28°41'08"W 1292.53' TO A #4 REBAR;
THENCE N75°41'37"W 20.65' TO A #4 REBAR;
THENCE N28°41'08"E 1278.93' TO A #4 REBAR;
THENCE N75°34'03"E 27.40' TO THE POINT OF BEGINNING.

SAID PARCEL CONTAINS 0.59 ACRES.

EXHIBIT "K"

FORM OF SALE ORDER

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| GLOBAL ENERGY HOLDINGS GROUP, INC., *et al.*, | ) | Case No. 09-14192 (PJW) |
|  | ) |  |
|  | ) | (Jointly Administered) |
| Debtors. | ) |  |
|  | ) |  |

**ORDER: (I) APPROVING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, PURSUANT TO SECTION 363; (II) MAKING SECTION 363(m) AND 363(n) FINDINGS IN FAVOR OF PURCHASER; (III) WAIVING FOURTEEN-DAY STAY PERIOD PROVIDED BY BANKRUPTCY RULE 6004(h); (IV) FINDING SALE EXEMPT FROM STAMP TAX AND SIMILAR TAXES; AND (V) GRANTING RELATED RELIEF**

This matter is before the Court on the Liquidating Trustee's Motion for Orders: (I) Approving Bid Procedures, Break-Up Fee, Overbid Percentage in Advance of Auction for Sale of Augusta Real Property and Related Assets; (II) Setting a Final Hearing for Approval of the Sale; (III) Approving Manner and Form of Notice of Sale; (IV) Approving the Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, Pursuant to Section 363; (V) Making Section 363(m) and 363(n) Findings in Favor of Purchaser; (VI) Waiving Fourteen-Day Stay Period Provided by Bankruptcy Rule 6004(h); (VII) Finding Sale Exempt from Stamp Tax and Similar Taxes; and (VIII) Granting Related Relief [ECF No. __], filed May ___, 2011 (the "Motion").[1]  The Court ruled on certain portions of the Motion on _____, 2011, in its Order: 1) Approving Bid Procedures, Break-Up Fee, Overbid Percentage in Advance of Auction for Sale of Augusta Real Property and Related Assets; 2) Setting a Final Hearing for Approval of the Sale; and (III) Approving Manner and Form of Notice of Sale [ECF No. __], entered _____,

---

[1] Capitalized terms used in this Order and not otherwise defined herein shall have the meaning ascribed to them in the Motion.

(W2361669.2)

US2000 12139018.3 .

2011. The Court, after listening to the evidence and argument of counsel, and based upon the record in these cases, makes the following mixed findings of fact and conclusions of law in respect to the Motion.

     A.     This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (M), (N) and (O). The statutory predicates for the relief requested are sections 105, 363, 1129, 1141, and 1146 of the Bankruptcy Code, Rule 6004 of the Federal Rules of Bankruptcy Procedure; and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court for the District of Delaware.

     B.     Due and proper notice of the Motion, the objection date and the hearing thereon have been given, the Motion having been served on: (1) the Office of the United States Trustee for the District of Delaware; (2) all entities known to have expressed a bona fide interest in acquiring the Property (as defined in the Motion); (3) all known entities who assert liens, claims, encumbrances, or other interests against the Property; (4) the members of the Post-Confirmation Committee appointed pursuant to the Plan; (5) all persons or entities who have filed a notice of appearance in the Debtors' cases; (6) all creditors of the Debtors; and (7) each of the thirty-one largest manufacturing employers in Augusta, Georgia.

     C.     A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all interested persons and entities.

     D.     The Trustee: (1) has authority pursuant to the Plan, the Confirmation Order and the Liquidating Trust established pursuant to the Plan and Confirmation Order (the "Liquidating Trust") to execute the Contract and all other documents contemplated

2

thereby; (2) has all the power and authority necessary to consummate the transactions contemplated by the Contract (the "Transactions"); and (3) requires no consents or approvals, other than this Order to consummate the Transactions.

    E.    The Trustee has exercised sound business judgment in deciding to proceed with those matters provided in the Contract, including without limitation, the Liquidating Trust's transfer to DSM of all of its rights, title and interests in the Property free and clean of all liens, claims, encumbrances or other interests therein.

    F.    Approval of the Contract and consummation of the Transactions at this time are in the best interests of the Liquidating Trust and its Beneficiaries.

    G.    Pursuant to Section 363, 1129, 1141 and 1146 of the Bankruptcy Code, the Plan, the Confirmation Order and otherwise, the Trustee has articulated good and sufficient business justification for proceeding with the Transactions.

    H.    The Trustee and DSM negotiated the Contract in good faith, without collusion, and at arms length. DSM is unrelated to any of the Debtors and/or the Liquidating Trust, is a good faith purchaser under Section 363(m) of the Bankruptcy Code and/or otherwise and, as such is entitled to the protections afforded to a good faith purchaser under the Bankruptcy Code and otherwise.

    I.    Neither DSM nor the Trustee has engaged in any conduct that would cause or permit the Contract to be avoided pursuant to Section 363(n) of the Bankruptcy Code.

    J.    The Transactions constitute the best and highest value for the Property and will provide a greater recovery than would be provided by any other available alternative. The value received for the Property is fair and reasonable.

3

K.    The Trustee may sell the Property free and clear of all liens, claims, encumbrances, rights of first refusal and other interests because, among other things, the Property was transferred to the Liquidating Trust as of the Effective Date pursuant to the Plan, free and clear of all liens, claims, encumbrances, and other interests, and no liens, claims, encumbrances, or other interests have attached to any of the Property following the Effective Date, and in any event the Property is being sold to DSM for a greater value than the aggregate value of all liens on the Property or each person or governmental unit could be compelled in a legal or equitable proceeding to accept a money satisfaction of such interest. The transfers of the Property to DSM pursuant to the Contract (the "Transfers") will be free and clear of any and all liens, claims, interests, and encumbrances in respect of the Debtors' or the Liquidating Trust's ownership.

L.    DSM does not constitute a successor to the Debtors or the Trustee because:

a)    Other than as explicitly set forth in the Contract, with respect to future liabilities, DSM is not expressly or impliedly agreeing to assume any of the Debtors' debts;

b)    The transaction provided in the Contract does not amount to a consolidation, merger or de facto merger of the Debtors or the Trustee and DSM;

c)    DSM is not merely a continuation of the Debtors or the Trustee; and

d)    The transactions are not being entered into fraudulently or in order to escape liability from the Debtors' debts.

M.    DSM would not have entered into the Contract and would not consummate the transactions contemplated thereby if the sale of the Property to DSM were not, except as otherwise provided in the Contract, free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever resulting from the Debtors' or Liquidating Trust's liability in accordance with Section 363 of the

4

Bankruptcy Code, or if DSM would, or in the future could be liable for any of such liens,

claims, encumbrances, and other interests or other liabilities, resulting from the Debtors'

or Liquidating Trust's liability, including, but not limited to, encumbrances or successor

liabilities in respect of the following: (1) any employment or labor agreements; (2) all

deeds of trust and security interests; (3) any pension, welfare, compensation or other

employee benefit plans, agreements, practices and programs, including, without

limitation, any pension plan of any Debtor; (4) any other employee, worker's

compensation, occupational disease or unemployment or temporary disability related

claim, including, without limitation, claims that might otherwise arise under or pursuant

to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair

Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal

Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker

Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of

1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with

Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of

1985, (j) state discrimination laws, (k) state unemployment compensation laws or any

other similar state laws, (l) state workers' compensation laws or (m) any other state or

federal benefits or claims relating to any employment with the Debtors or any

predecessors; (5) any products liability or similar claims, whether pursuant to any state or

federal laws or otherwise, including, without limitation, asbestos-related claims;

(6) reclamation, environmental or other claims or liens arising from conditions first

existing on or prior to the closing of the Transactions (including, without limitation, the

presence of hazardous, toxic, polluting or contaminating substances or waste) that may be

5

asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, or similar state statute; (7) any bulk sales or similar law; (8) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (9) any theory of antitrust; and (10) any common law doctrine of de facto merger or successor or transferee liability, successor-in-interest liability theory or any other theory of successor liability.

N.     Except as specifically set forth in the Contract, DSM shall not have any liability in respect of a liability, claim (as that term is defined in section 101(5) of the Bankruptcy Code) or other obligation of or against any of the Debtors or the Liquidating Trust related to the Property by reason of the transfer of the any of the Property to DSM. DSM shall not be deemed, as a result of any action taken in connection with the purchase of the Property, to be a successor to the Debtors for purposes of successor liability or related doctrines and theories of legal and equitable recovery. DSM is not acquiring or assuming any lien, claim, interest, encumbrance, warranty or other obligation of the Debtors or the Liquidating Trust except as specifically set forth in the Contract.

O.     Except as provided in the Contract, consummation of the Transfers does not and will not subject DSM to any debts, liabilities, obligations, commitments, responsibilities or claims of any kind or nature whatsoever, whether known or unknown, contingent or otherwise, existing as of the date hereof or hereafter arising, of or against the Debtors, any affiliate of any of the Debtors by reason of such transfers and assignments under the laws of the United States, except that DSM shall be liable for payment of any liabilities arising following the closing.

6

{W2361669.2}

P.      Section 1146(a) of the Bankruptcy Code provides that "[t]he issuance, transfer, or exchange of a security, or the making or delivery of an instrument or transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(a).  The Plan was confirmed by this Court on October 26, 2010.  The Plan contemplated the Trustee's orderly liquidation of the Debtors' remaining assets, including the Property that is the subject of the Motion, in order to maximize the return to the Debtors' bankruptcy estates and their creditors.  Accordingly, the proposed sale of the Property is a fundamental aspect of the liquidation contemplated by the Plan and is occurring after the Debtors obtained confirmation of such Plan.  As a result, the sale of the Property shall be exempt from stamp, transfer, sales, recording or any other similar taxes under section 1146(a) of the Bankruptcy Code.

Q.      The Liquidating Trust has good, clear, and marketable title to the Property and, accordingly, the Transfers to DSM will be legal, valid and effective transfers.

R.      The relief requested in the Motion is necessary and appropriate to assist the overall liquidation of the Liquidating Trust's assets and to prevent the deterioration of the Liquidating Trust's assets, and is in the best interests of the Liquidating Trust, and its Class I Beneficiaries.

S.      The Trustee has articulated good and sound business reasons for waiving the fourteen-day stay period with respect to this Order otherwise imposed by Bankruptcy Rule 6004(h).

T.      The Trustee has demonstrated that: (1) it is an exercise of his sound business judgment to sell the Property as specified in the Contract; and (2) the sale of the

7

Property as specified in the Contract is in the best interest of the Liquidating Trust, and its Class I Beneficiaries.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.  The Motion and the relief sought therein is granted in all respects and the terms and conditions of the Contract are approved, with the sale price of $2,500,000.00 to be paid by DSM at closing.

2.  The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.  All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are overruled on the merits.

4.  The Transactions, the Transfers, and the Contract, are hereby approved in all respects and authorized and directed under sections 363, 1129, 1141, and 1146 of the Bankruptcy Code and otherwise.

5.  The Trustee is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Contract, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Contract, and to take all further actions as may reasonably be requested by DSM for the purpose of assigning, transferring, granting, conveying and conferring to DSM, or reducing to possession

8

all of the Property, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Contract.

6.    Pursuant to the Plan, Confirmation Order and Sections 105(a) and 363(f) of the Code, upon the closing under the Contract, DSM shall acquire all right, title and interest in and to the Property, free and clear of: a) all mortgages, liens, charges, claims, other interests, counterclaims, rights of setoff, rights of recoupment and similar rights, security interests, security s, conditional sale or other title retention s, limitations, pledges, options, assessments or other such charges, encumbrances, adverse interests, or exceptions to or defects in title or other ownership interests, leases, and licenses resulting from the Debtors' or the Liquidating Trust's ownership, acts or failure to act (collectively, "Interests"); and b) all debts or obligations of any kind or nature arising in any way in connection with any acts, or failures to act, of the Trustee, the Debtors or the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), whether known or unknown, contingent, fixed, liquidated or unliquidated (collectively, the "Claims"), except as provided in the Contract, with all such Interests and Claims released, terminated and discharged as to the Property.

7.    Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against DSM, its respective successors, assigns and benefit plans or the relevant Property, with respect to any: (a) lien, claim, encumbrance or other interest arising under, out of, in connection with or in any way relating to the Trustee, the Liquidating Trust or the Debtors; or (b) successor liability in any way relating to Interests or Claims, including, without limitation, the following actions:

9

{W2361669.2}

- ▪ Commencing or continuing in any manner any legal action or other proceeding against DSM or its successors, assets, properties or benefit plans;

- ▪ Enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against DSM, its successors, assets, properties or benefit plans;

- ▪ Creating, perfecting or enforcing any lien or other encumbrance against DSM, its successors, assets, properties or benefit plans;

- ▪ Asserting any setoff, right of subrogation or recoupment of any kind against any obligation due to DSM or its successors;

- ▪ Commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or

- ▪ Revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Property or conduct any of the businesses operated with the Property.

8.    As of the Closing in accordance with the Contract, all of the Liquidating Trust's interests in the Property will be transferred to and vested in DSM, subject to the fulfillment of the terms and conditions of the Contract. As of the Closing, this Order will be considered and constitute for all purposes a full and complete general quitclaim assignment, conveyance and transfer of the Property, transferring the Liquidating Trust's title and interest in the Property to

10

{W2361669.2}

DSM. All governmental recording offices and all other parties, persons or governmental units are hereby authorized and directed to accept this Order as such a quitclaim assignment and/or quitclaim deed, and, if necessary, this Order will be accepted for recordation on or after the Closing, as conclusive evidence of the transfer of title to the Property conveyed to DSM at the Closing.

9.      Pursuant to sections 105(a) and 363(f), 1129 and 1141 of the Bankruptcy Code the Plan and Confirmation Order, the Trustee is authorized to, and upon closing of the Transactions contemplated by the Contract, shall transfer title to the Property to DSM free and clear of: (a) all Interests and Claims, whether known or unknown, whether contingent, unliquidated, disputed, whether imposed by agreement, understanding, law, equity or otherwise, including without limitation those of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, and whether arising before or after the commencement of these Chapter 11 cases, except as to the extent provided in the Contract.

10.     All persons and governmental units holding interests or claims against the Debtors arising before the Closing, or out of events occurring before the Closing, of any kind and nature with respect to the Property, are barred from asserting such Interests and Claims of any kind and nature against DSM, its successors or assigns, its property or the Property.

11.     All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Trustee to sell and transfer the Property to DSM in accordance with the terms of the Contract and this Order (other than by an appeal timely taken with respect to this Order or a motion timely made under Bankruptcy Rules 9023 or 9024).

11

{W2361669.2}

12.    Upon consummation of the transactions contemplated by the Contract, all liens, claims, encumbrances and other interests shall be released, terminated, and discharged as to the Property to the fullest extent permitted by law without necessity of any further notice to, or action by, any person or entity and all persons or entities holding liens or claims of any kind and nature against the Liquidating Trust, the Trustee, the Debtors or any of their affiliates or with respect to any of the Property and are hereby barred and enjoined from asserting such liens, claims, encumbrances and other interests against the Property or DSM or its successors, designees, or assigns and any of their respective affiliates, stockholders, members, officers, directors, employees, agents, or representatives. All liens, claims, encumbrances and other interests shall be transferred at the Closing to the proceeds from the sale of the Property to the same extent and with the same priority and validity as such liens, claims, encumbrances and other interests had in the Property prior to Closing.

13.    Upon the Closing, DSM is hereby granted immediate and unfettered access to the Property.

14.    No bulk sales law or any similar law of any state or other jurisdiction will apply in any way to the Liquidating Trust's sale of the Property to DSM.

15.    If any person that has filed financing statements or other documents evidencing Interests on or in the Property shall not have delivered to the Trustee before the Closing, in form proper for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests or other interests that the person or entity has with respect to the Property, DSM is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Property.

· 12

16.    Nothing contained in any order entered in these cases shall conflict with or derogate from the provisions of the Contract or the terms of this Order.

17.    The Contract and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material.

18.    DSM is a good-faith purchaser, entitled to the protections of section 363(m) of the Bankruptcy Code and/or otherwise entitled to all the protections afforded a good faith purchaser under Section 363(m), in the event that this Order is reversed or modified on appeal; provided, however, that nothing herein shall be construed to release, waive, or otherwise modify claims the Liquidating Trust or DSM may have against each other relating to Transactions or the Transfers or occurrences to be consummated under the Contract, which are fully preserved.

19.    The consideration provided by DSM for the Property, pursuant to the Contract, constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the United States.

20.    The Transfers are fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code and/or otherwise.

21.    The failure specifically to include any particular provision of the Contract in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Contract be authorized and approved in its entirety.

22.    As provided by Bankruptcy Rule 7062, this order shall be effective and enforceable immediately upon entry. This Order shall not be subject to the stay arising under

13

Bankruptcy Rule 6004(h) and such rule is waived, and the parties to the Contract may accordingly proceed immediately to Closing.

23.    In accordance with section 1146(a) of the Bankruptcy Code and Paragraph 33 of the Confirmation Order, the transfer of the Property pursuant to this shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, including but not limited to the transfer tax on the Deed (as defined in the Contract) with respect to the sale of the Real Property (as defined in the Motion), and the appropriate state or local governmental officials or agents are hereby directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

24.    This Court shall retain jurisdiction to decide and resolve any disputes arising between DSM and the Debtors or any other person or entity with respect to the Contract or any of the related documents or this Order.

Dated:_____         _____
                                      THE HONORABLE PETER J. WALSH
                                      UNITED STATES BANKRUPTCY JUDGE

{W2361669.2}